# STATE v. ROBERT MILLER.[1]

February 10, 1922.

No. 22.705.

**Homicide—verdict sustained by evidence.**

1. The evidence justified the verdict of murder in the second degree.

**Indictment sufficient.**

2. The indictment is not defective in charging a design on the part of defendant to "effect the death of Albert W. Fenton, or of another."

**Charge to jury not prejudicial.**

3. No reversible error occurred in charging that the jury need not consider the advice of counsel in respect to the arrest of one Bowman with whom defendant had had trouble and who, he believed, was approaching armed when the homicide occurred.

**Cross-examination of defendant prejudicial.**

4. It was error to permit cross-examination of defendant as to threats to shoot others, there being no suggestion in the record that defendant thought Fenton was any one else than Bowman. This error was aggravated by the state calling a witness to show that some months before defendant had said he would shoot one Pearson. Certain other testimony, which accentuated the evil effect of the evidence thus received, was improper.

**Copy of charge to jury.**

5. Defendant was not entitled to a copy of the charge of the court before the final argument to the jury.

**Charge to jury—self defense.**

6. No advantage can be taken by defendant for failure to more fully instruct as to the law of self defense.

**Instruction improper.**

7. The evidence was such that it was not proper to instruct that defendant was under all circumstances responsible for what his brother thought and did when firing the fatal shots.

[1]Reported in 186 N. W. 803.

**Manslaughter in second degree.**

    8. It was not error to refuse to submit manslaughter in the second degree. The submission of that degree might be proper as to defendant's brother, but, if the brother was only guilty of manslaughter in the second degree, defendant was entitled to an acquittal.

**Manslaughter in first degree—heat of passion.**

    9. The evidence justified the submission of first degree manslaughter. Heat of passion may be caused by fright as well as by anger.

Defendants were jointly indicted by the grand jury of Beltrami county charged with the crime of murder in the first degree, tried separately in the district court for that county before Stanton, J., and a jury which found Robert Miller guilty of murder in the second degree. From an order denying his motion for a new trial, Robert Miller appealed. Reversed.

*Middleton & Middleton* and *M. J. Daly*, for appellant.

*Clifford L. Hilton*, Attorney General, *James E. Markham*, Assistant Attorney General, and *Graham M. Torrance*, County Attorney, for respondent.

HOLT, J.

The defendant, Robert Miller, and his brother George were jointly indicted for the crime of murder in the first degree. They had separate trials. After the acquittal of George, Robert Miller was tried and found guilty of murder in the second degree. His motion for a new trial being denied, sentence was passed and he appeals.

These facts seem undisputed:

In a newly-settled part of Beltrami county, about 17 miles south of Baudette, this defendant had a claim. He was 31 years old. In January, 1921, he and his family, consisting of his wife and three small children, were temporarily living with his brother George, who was 10 years younger. About 3 miles northeasterly from George's claim was a meadow owned by one Diedrick, who had sold the hay stumpage to Robert Miller for 3 seasons, beginning with 1918. The latter sublet a part thereof for the season of 1919 to Ellis Bowman, who lived a short distance east from the meadow. Some misunder-

standing in respect to cutting the hay arose in 1920. Bowman and his family started in to cut and haul away some of the hay. George observed this and informed his brother who was in Baudette. The latter sought legal advice. As a result Bowman was charged first with grand larceny, but afterward with petit larceny; the last charge being set for trial on February 18, 1921. Threats of some sort vented by Bowman reached the ears of the Millers previous to the homicide. On January 12 a large haystack put up by Robert Miller on the meadow was burned. He suspected the fire to have been set by someone in the Bowman family. On January 25 the Millers began to haul what hay remained away from the meadow. This seems to have been put up in very small stacks or large cocks. And it is to be inferred that this hay had, in part at least, been cut by the Bowmans, but that perhaps the Millers had gathered and stacked it. The Millers came for the second load shortly before sunset on January 25, 1921; a little later, a neighbor, Nick Siminovik, also arrived to help them haul. He was given a shovel and told to go with his team to a small stack some 93 paces east and slightly north of the stack the Millers were loading from. While Nick was shoveling away the snow from the stack he was to load, the Millers were working, George being upon the load and this defendant pitching up the hay from the stack bottom, which was now not much higher than the surface of the snow. As these parties were so working Albert W. Fenton, a young settler who had a claim a few miles away, and who was engaged in sawing stove wood for the settlers with a portable saw, came from his last job about a mile distant from this meadow. He was on skis, carrying a rifle in his hand, and approached the Millers directly from the north. When about 200 feet away he received two mortal gunshot wounds. One bullet entered near the navel and was found imbeded in his back, half an inch under the skin. It was a soft nosed bullet. It had made a hole large enough to admit the fist, and had severed completely the large intestine. Medical testimony was that it would produce death in less than half an hour. The other bullet entered about one inch above and slightly forward of the right ear. It tore away the whole top of the head and scattered the brains and bones of the head some

distance. Because of this explosive effect it was impossible to determine the course of the bullet through the head. Fenton fell with his head to the east and the feet to the west of the skis, which remained in the course he had come, the rear end of one ski being up against his body and the front end of the other just behind his thigh. He lay on his left side, his bare right hand touching the barrel of the rifle, which lay across his left leg with the butt towards the feet. On his left hand was a leather mitten over a woolen one. The right hand mitten was in front of the body. His cap was from 6 to 10 feet directly east of his head. There was an exploded shell in the rifle and one unexploded in the chamber. Two empty shells were found about 200 feet north of where Fenton lay where his ski tracks passed through a two strand wire fence. One empty shell was found where the Millers were loading. George had a rifle which he had stood in the snow near the stack. The rifle was the same make as Fenton's, a 250-3,000 Savage, the bullet of which travels with the speed of 3,000 feet a second. Fenton was an expert shot. He was left-handed. He shot from the left shoulder, used a hammer with the left hand, and also pitched ball with that hand. His rifle ejected the empty shells towards the right. The empty shells found by the fence were just east of the ski tracks.

The evidence is conflicting as to what took place from the time Fenton was noticed by the three men at the haystacks. No one places him as far north as the fence. Nick testified that he first noticed Fenton about 50 or 75 feet north of where he fell. He was striding along on his skis, swinging the rifle in his right hand. He saw George slide from the load to the stack bottom, and Robert giving the rifle to George. Both stood on the south side of the load. A shot was fired, but Fenton paid no attention, coming right along. A second shot rang out from behind the load. Fenton hesitated or staggered. At that moment a white owl was settling on a charred tree stump a few feet northeast from Nick, attacting his attention for a second. At that instant he heard a third shot; George's team was restive; he saw Fenton prone on the snow; heard a death gurgle, but no further move or sound from him. He hurried over to the Millers asking: "Who is that?" Robert said: "Look out; he

can shoot you," and, pushing Nick behind the load, added: "That is the Bowmans." He also inquired of Nick how many shot he heard. Nick told him three, whereupon George spoke up, saying: "That is right; he shoot twice and I shot once and get him." Nick hurried back, got his team and started ahead of the Millers, the latter, walking on the south side of the load for some distance, called to Nick to see whether the man moved. They drove home. The Millers slid off the hay, turned the stock loose, loaded the wife and children in the sled, and drove to the home of C. R. Crabtree four miles distant. Mr. Crabtree was constable. Relating what had occurred Robert Miller stated that they had had a duel in the meadow, that he directed George to aim at the man, and that George was no more in for it than he was. Nick testified that the Millers did not warn or call out to Fenton before the gun was fired, nor during or after firing, and that Fenton never spoke. Nick had his cap pulled down over his ears.

The Millers testified that Fenton, whom they took to be Bowman, shot direct at them when George slid off the load and Robert ran for the rifle; that both went behind the load; that Fenton fired a second bullet which they heard strike the load, passing between them; that Robert called to George to shoot to let him know that they were armed; that he did not tell George to aim at Fenton; that he hollered at him; that when Fenton's bullet struck the load George went to the other end, threw up the gun and shot without taking aim, without any intention of hitting the man, but merely to warn or scare him off. That the admissions to Crabtree and others, by Robert that he advised George to aim at, or to shoot at, Fenton, and that he was responsible for what George did, were not true, but that he so admitted in order to shield George, or to share the responsibility with him. Their testimony also was that after George fired the last shot Fenton called out: "Who are you shooting at?" or "What are you shooting at?" and after that, when down, he raised on his elbow and called in a strong clear voice to them to come over quickly; but that they did not dare to go, and started for home, thinking the Bowman family would be there for revenge.

The argument is also made in their behalf that the shells at the fence indicate that Fenton had shot at them. It is conceded that defendant requested the parties who went to the meadow on the night of the shooting to ascertain if the one shot needed assistance, and those who went the next morning to bring in the body, to go back along the ski track and look for empty shells, and that two shells were found at the fence, as stated. In the behalf of defendant the argument is also advanced that the bullet which shattered Fenton's head did not come from the last shot fired by George, because it would have been an utter impossibility for him to have spoken after so hit; and, furthermore, the empty shell in Fenton's gun not ejected, as would have been the case had it been fired before Fenton was wounded, indicates that it was fired when he was down so that he could not manipulate the gun as is ordinarily done by one accustomed to such weapon. Also that the location of Fenton's cap and the brain and bone tissue from his skull, directly east from the position of his head, proves that this wound could not have come from George Miller's gun, but from Fenton's, either being discharged as he fell when hit by the bullet which entered his abdomen, or, perhaps, intentionally fired by him after the others left, to end the pain and misery, realizing that the wound was mortal.

In addition to stating the divergent accounts of the shooting, it should be added that there can be no possible doubt of the fact that the Millers believed that the man approaching them was Bowman bent on their harm, and that their overwrought fears on that score resulted in the regrettable tragedy. If any shots were fired by Fenton before George Miller used his gun, it is a moral certainty that they were not directed towards the Millers. It was for the jury to solve the contradictions between the stories of Nick and the Millers, taking into consideration that their admissions differed from their testimony on the witness stand. It was also within the jurors' province to consider the physical facts adverted to of which there was no dispute, and others appearing from the evidence, to aid them in arriving at the truth in respect to the death of Fenton and defendant's part therein. We may also add that there is a dispute as to the time of the occurrence, the state contending that the shoot-

ing took place when the sun was still a foot above the horizon, and shining brightly. The defendant said that the sun was below and it was getting dusk. The owl might be supposed to strengthen defendant's contention in this respect as well as tend to explain the presence of the empty shells near the fence.

Without further discussion of the evidence we hold that the jury, accepting as true, Nick's account and defendant's statements made on the evening of the homicide, and rejecting entirely the testimony of defendant and his brother George, could rightfully find murder in the second degree. It does not matter whether the bullet, which shattered Fenton's brain, came from his own gun or from George's so far as affecting the guilt of the act of firing the bullet which caused the abdominal wound. That wound was necessarily mortal, and, beyond dispute, was inflicted by George. It remains to consider whether any of the errors assigned are of such character that a new trial should be granted.

There is no merit in the claim that the indictment is fatally defective because, in charging a premeditated design to kill Albert W. Fenton, the words "or another" were added. Were those words omitted no flaw could be urged. Intent to kill a human being was presumed from the fact of killing Fenton, and disproving such intent was open to defendant under the present indictment the same as if the words quoted had not been there.

The state elicited the fact that defendant had sworn out two complaints charging Ellis Bowman with hay stealing. The only purpose, no doubt, was to prove malice towards Bowman. To meet this attack defendant offered to prove that he made the complaints on the advice of counsel. It was ruled out. We think this error. However, subsequently the county attorney, in cross-examining defendant, brought out the fact that defendant had sought and acted on legal advice in swearing out the complaints. The court seemed to have forgotten that testimony when in the charge he stated that counsel's argument based on the fact of having had legal advice was improper. This was wrong. But were this the only error it ought not to cause a retrial, for the advice of counsel in the hay controversy and the right or wrong of Bowman's arrest could have

little, if any, bearing upon the motive in resorting to the use of the rifle in the meadow.

Defendant always maintained that he believed Fenton to be Ellis Bowman, and that he knew of none other who bore him enmity. Against objections the prosecuting attorney was permitted to cross-examine him as to others against whom he had made threats to kill. In view of the fact that on his direct examination, as well as in all his statements concerning the homicide, defendant had not given the slightest hint that he took Fenton to be any one else except Bowman, there was really no justification for the attempt by cross-examination to thus attack defendant's character and bring in a collateral issue. However, had it stopped with the answers of defendant, there could not have been so much ground of complaint. But that was not all. The state was permitted to lay a foundation for impeachment and to contradict him by calling a witness, the village marshal at Spooner, who testified that some time before when defendant lived there, he inquired of the officer whether he did not have the right to shoot a sewing machine agent, Pearson, who persisted in calling at his home in his absence; that, when the officer told him he had not, he insisted that he had and would do so if he came again. The question for the jury was whether defendant premeditatedly or designedly killed the deceased, or killed him in self defense. In determining this issue it was put before them as proper for consideration that defendant a few months before threatened to shoot a man, debated with an officer of the law his right to do so, insisting thereon even after being told he had none. A reviewing court, having before it the question of the propriety of the finding of guilty, does not readily keep from its mind such a fact as that to which the officer testified. The jury did not know that the evidence was not proper to be considered by them in determining defendant's guilt or innocence. Indeed, it had observed that defendant's counsel objected earnestly to the evidence of the officer as not competent proof of guilt, but that the court received it as competent. It understood that it had a bearing on the issues.

This evidence became more prejudicial because of some testimony, we think, improperly drawn out from Nick by the state. It was

this:   That the thought came to the witness, when he saw the shooting, that Robert and George might shoot him and then claim that Fenton shot him, Nick, and hence they justifiably fired at Fenton. There would then be no witness against them and their defense would be perfect.   This explanation of Nick's frame of mind, though fanciful and savoring somewhat of an afterthought, fitted well in with the theory developed through the officer's testimony that defendant was a desperate character and likely to shoot without warrant.   The testimony of the officer and that part of Nick's just referred to was a direct attack upon defendant's character when he had not made it an issue.   It served well upon which to predicate an unwaranted argument that defendant was of a vicious, reckless disposition, prone to shoot a human being on slightest provocation. That evidence of such character is not competent was held in State v. Nelson, 148 Minn. 285, 181 N. W. 850, a homicide case, and has been held in other classes of clases.   Campbell v. Aarstad, 124 Minn. 284, 144 N. W. 956; State v. Taylor, 144 Minn. 377, 175 N. W. 615.   We think the evidence referred to was incompetent, and so prejudicial that a new trial should be had.

Before the closing arguments began, defendant's counsel requested the court to furnish him with a copy of the charge, under section 7802, G. S. 1913, which provides:

"Before the argument begins either party may submit to the court written instructions to the jury, opposite each of which the judge shall write the words 'Given', 'Given as modified', or 'Refused'; and the court, in its discretion, may hear arguments before acting on such requests.   And the court on its own motion may, and upon requests of either party shall, lay before the parties before the commencement of the argument any instructions which it will give in its charge, and all such instructions may be read to the jury by either party as a part of his argument.   But at the close of the argument the court may give, with the instructions so approved, such other instructions as may be necessary fully to present the law of the case."

It is clear from the plain reading of this statute that the part of the charge which counsel is entitled to have delivered to him before he begins his argument is limited to the instructions previously submitted to the court, by either party, and which he has had the opportunity to consider and mark as "Given" or as "Modified." The court did not err in refusing to furnish a copy of the charge at counsel's request.

Exception is taken to the charge. In the main it is clear, accurate and adequate. The claim that there was not a full and complete statement of the law of self-defense cannot avail defendant, for there was no request to instruct more specifically upon that subject. Self-defense was submitted, the court saying: "Our law concedes the right of self-defense and it concedes the right to kill in self-defense, but only in extremity and when no other reasonable means to avoid great bodily harm are apparent to the person resorting to it, and that is a principle of law which you must bear in mind and apply in considering the evidence in the case."

The sentence just prior to the one quoted is assigned as prejudicially erroneous. It reads:

"If you find that George Miller and this defendant, Robert Miller, did believe and had reasonable ground to believe, that the approaching man was Ellis Bowman, then it is your duty to consider the evidence on the theory that the man who was killed was in fact Ellis Bowman, in which case you will carefully consider and weigh the evidence and reach a conclusion in your own minds as to whether George Miller, the one who fired the fatal shot, was justified in resorting to the means of defense which he then used, whether the danger was so imminent as to justify a man of ordinary prudence, in the exercise of reasonable care, to resort to the means resorted to by him."

It can hardly be claimed that this instruction is correct as to defendant, unless the jury found that he directed George to shoot at the deceased. If defendant merely handed the gun to George, and directed him to shoot it off to let the supposed Bowman know that they were armed, and George wilfully or negligently fired it at

the man, defendant ought not to occupy the same position as George. In that situation George might be found guilty of unjustifiable homicide, but Robert should be held not guilty. A direction to shoot to warn was not advising, aiding or abetting in a wrong. No harm could reasonably be expected from shooting off a rifle for such purpose. It was wrong to make defendant's guilt depend upon the knowledge, belief and intent of another who, in doing a harmless act requested by defendant, acted culpably negligent or otherwise. Arnold v. Com. 55 S. W. 894, 21 Ky. Law Rep. 1566; Mickey v. Com. 9 Bush. (Ky.) 593, 594. It may perhaps be urged that the error here pointed out is not available, for no instruction was requested to cover this phase of the evidence, and no suggestion was given before the jury retired that there was anything amiss. It is now called attention to so that the rights of the parties may be more clearly defined upon another trial.

Error is assigned upon the refusal to give this requested instruction: "When one kills another mistaking him as an enemy, if the mistake was an honest and non-negligent one, the right to plead self-defense is the same as it would have been had the person killed actually been the enemy whom he was supposed to be." This instruction might well have been substituted for the one actually given, for the latter is lengthy and more involved. But, except in the respect above alluded to, wherein Robert was made responsible for whatever George did or deemed necessary to do in the premises, the instructions given upon this phase of the evidence were substantially correct and not misleading.

Defendant requested an instruction that, if the jury did not find him guilty of murder in the first or second degree and found the killing neither excusable nor justifiable, they might find him guilty of manslaughter in the second degree, if they found beyond a reasonable doubt that the death of Alfred W. Fenton was caused by the culpable negligence of the defendant. The definition of manslaughter in the second degree which might be claimed applicable is:

"Such homicide is manslaughter in the second degree when committed without a design to effect death * * * by any act, procurement or culpable negligence of any person which, according to the provisions of this chapter, does not constitute the crime of murder in the first or second degree, nor manslaughter in the first degree." G. S. 1913, § 8612.

It is peculiar that murder in the third degree is not also excluded. But perhaps its own definition, as interpreted in State v. Nelson, supra, excludes it. The court rightly refused to submit second degree manslaughter. Had George been tried jointly with defendant, it might properly have been submitted as to George on the theory that he was culpably negligent in the handling of the rifle when he shot to scare, but then this defendant would have been entitled to an instruction that if the jury found George guilty of no higher degree of homicide than manslaughter in the second degree, he, Robert, should be acquitted. For, as already stated, there could be nothing criminal in the advice to shoot to scare under such circumstances. Defendant's claim in this respect is not so incredible but that the jury might find it true and also find it to be true that George was culpably negligent; this would justify a verdict of second degree manslaughter against George. See Ringer v. State, 74 Ark. 262, 85 S. W. 410; State v. Vance, 17 Iowa, 138; State v. Hardie, 47 Iowa, 647, 29 Am. Rep. 496; Embry v. Com. (Ky.) 12 S. W. 383; People v. Stubenvoll, 62 Mich. 329, 28 N. W. 383; Bliss v. State, 117 Wis. 596, 94 N. W. 325. But Robert could not be found guilty because of George's culpable negligence, Robert alone, or both together, not being otherwise at fault. There is no evidence tending to show that Robert knew George to be negligent or incompetent in the use of firearms, or liable to lose his head under excitement, so that there would be any basis for the jury to find that it was culpable negligence for Robert to merely hand the rifle to George and request him to shoot to warn deceased.

In view of another trial it is not amiss to say that lower degrees of homicide than murder in the second degree could well have been submitted, namely, as low as manslaughter in the first degree,

which, as applied to one phase of the evidence herein, is defined thus: "Such homicide is manslaughter in the first degree when committed without a design to effect death * * * in the heat of passion * * * by means of a dangerous weapon." G. S. 1913, §§ 8608, 8609. The jury could have found that Robert placed the gun in George's hand and in the heat of passion advised shooting at Fenton. It cannot well be doubted that this deplorable tragedy resulted from the overwrought fear and, perhaps, cowardice which seized the Millers when they saw one whom they took to be Ellis Bowman striding towards them with a rifle, they being engaged in carrying away the hay he had begun to cut and which he claimed. Within the meaning of the law, not only anger but fright may cause that heat of passion which dethrones reason and reduces murder to manslaughter. In State v. Doherty, 72 Vt. 381, 48 Atl. 658, 82 Am. St. 951, a charge was approved which told the jury "that if the drawing of the revolver and the use of it was an afterthought subsequent to the encounter, wholly due to the then nervous excitement, fear, anger and heat of blood," the killing would be manslaughter unless justifiable. The court said: "The charge placed the elements of fear, fright, nervousness and cowardice on the same plane with anger and heat of blood. There is no other rule." See also Meulay v. State, 26 Tex. Ct. App. 274, 9 S. W. 563, 8 Am. Rep. 477; Steen v. State, 88 Tex. Crim. 256, 225 S. W. 529.

For the errors hereinbefore discussed we deem it proper that defendant be granted another trial.

The order and judgment are set aside, the warden of the state penitentiary at Stillwater is directed to surrender the defendant to the sheriff of Beltrami county, and the cause is remanded for a new trial.