# STATE v. MORRIS NATHANIEL KEATON.

104 N. W. (2d) 650.

July 8, 1960—No. 37,838.

*Solomon Wasserman,* for appellant.

*Walter F. Mondale,* Attorney General, *George M. Scott,* County Attorney, and *Bruce C. Stone* and *Ronald I. Meshbesher,* Assistant County Attorneys, for respondent.

DELL, CHIEF JUSTICE.

Defendant appeals from a judgment of conviction of murder in the first degree.

On November 20, 1958, at approximately 9 p. m. the defendant went to a liquor tavern in Minneapolis known as "South of the Border," which was connected with the "Key Club," to meet his girl friend, Rita Toliver. Together they then approached a table occupied by a man described as a "little fellow" and William Leroy Farrell. Defendant, according to the state's witness Henry Bailey, asked Rita, "Is this the man?" and then struck the "little fellow" with his fist. A fight followed between the defendant on one side and the "little fellow" and Farrell on the other side. During the altercation the defendant claims he was "beaten up" by Farrell and the other man and his glasses were knocked off and broken. After the fight the defendant and Rita proceeded at once to the defendant's home for the purpose, so he claims, of cleaning up. As he opened a bureau drawer to get another pair of glasses to replace the ones broken, he happened to see a revolver which he testified he had once taken in pawn. He took the gun, so he claims, to protect himself from another such assault since, according to his version, he intended to return to the tavern to explain to the management how the fight started. After the killing, according to the testimony of Thomas W. Seawell, one of the patrolmen for the Minneapolis police traffic division, an arresting officer, defendant said that "he got the gun and went back [to the Key Club] looking for Mr. Farrell" because "he was going to even things up." When he arrived at the club he asked the doorman if he knew who the persons were who had been in the fight but the doorman was unable to give him that information. After waiting until 1 a. m., when the club closed, the defendant and Rita left and went to an eating place known as "Cicero's," arriving there at about 1:30 a. m. The defendant claims that he picked up the gun from the floor underneath the seat of his car and "took the gun with me as a precaution from it being stolen because it wasn't my gun and I didn't want it stolen."

About an hour later he claims that as he and Rita were leaving Cicero's he was "bumped" by Farrell who was then entering the door.

He said a few words passed between them and Farrell then walked into the lavatory near the rear of the restaurant. He said he then turned and followed Farrell into the lavatory and shortly afterwards a shot was heard. According to the state's witnesses Farrell then came "rushing" out of the washroom. When he got a few feet away from the lavatory door, the defendant shot Farrell through the head killing him almost instantly. The defendant's claim was that he went into the washroom to find out why Farrell had hit him and that Farrell said "he hit me because it looked like I was getting the best of his friend"; that thereupon Farrell again struck him and that in the struggle that followed "I went down" and "he was steady pounding me about the face, the neck and the head at the time." He claims that he then remembered that he had the gun in his pocket so he "pulled the gun out" as Farrell "was still over my back, on top of me" and that "when he [Farrell] grabbed the [defendant's] wrist the gun fired into the floor." He further claims that as he was coming up off the floor he was trying to swing Farrell off; that it was then as Farrell went out of the door that the second shot accidentally went off and "that is when he [Farrell] fell"; that he didn't recall pulling the trigger nor did he intend to fire the gun but he admits his finger was on the trigger and that Farrell fell about 4 feet from the washroom.

After the shooting the defendant said he stepped over Farrell on the floor and "Immediately coming out of the door, Rita was right on my arm" as they left Cicero's and went to the defendant's home. On the way he said he removed the cartridges from the revolver and threw them out of the window. At about 3:15 a. m. as the defendant, Rita, and a neighbor were supposedly driving to the police station, the defendant was arrested by an officer who identified the car which, according to the officer's testimony, was traveling at about 40 to 45 miles per hour.

■ The defendant first assigns as error the following instruction given by the trial court:

"* * * The offense of murder in the first degree may be found from the mere fact and circumstances of the killing, and where there is no circumstance to prevent or rebut the presumption, the law will pre-

sume that the unlawful act was *with premeditated design* and was prompted and determined on by the ordinary and natural operations of the mind." (Italics supplied.)

The distinguishing feature of first-degree murder is premeditation and this, being a process of the mind, is ordinarily incapable of direct proof. Premeditation must usually be inferred from all of the circumstances surrounding the homicide.[1] The first part of the quoted instruction does nothing more than correctly state this permissible inference. However, in so far as the instruction directs that premeditation is to be presumed from the unlawful act of killing, it is erroneous.

In this state and generally elsewhere a number of so-called presumptions have been developed relating to criminal intent and malice.[2] They are generally based upon the maxim that a person is presumed to intend the natural, probable, and usual consequences of his own acts.[3] One of the most familiar of these presumptions is that stated in the homicide case of State v. Brown, 41 Minn. 319, 323, 43 N. W. 69:

"* * * where there are no circumstances to prevent or rebut the presumption, the law will presume that the unlawful act was intentional and malicious, and was prompted and determined on by the ordinary and natural operations of the mind."

This principle, derived from the common law, is said to be a product of public necessity, without which convictions in unwitnessed homicides would be impossible to obtain.[4] Although subject to criticism,[5] it has

---

[1]State v. Gavle, 234 Minn. 186, 48 N. W. (2d) 44.

[2]As pointed out by Professor Wigmore, these types of "presumptions" are often treated either as substantive rules of law or merely permissible inferences. See, 9 Wigmore, Evidence (3 ed.) § 2511*a*.

[3]See State v. Welch, 21 Minn. 22, 26, where the court said: "Every man is *conclusively* presumed to intend his own voluntary acts." (Italics supplied.) Most courts, however, treat this as a true presumption. 1 Wharton, Criminal Evidence (12 ed.) § 131.

[4]For a careful study of the history and purpose of this rule, see State v. Payne, 10 Wash. 545, 39 P. 157.

[5]Where the specific intent to kill is a necessary element of the offense, the application of a presumption of such intent would appear inconsistent

been repeatedly applied in this state.[6] However, premeditated design denotes preexisting reflection and deliberation encompassing more than the mere intent to kill. Consequently, it is uniformly held that the element of premeditation required for first-degree murder is not within the purview of this rule.[7]

It is not correct, as sometimes reported, that this court in State v. Lautenschlager, 22 Minn. 514, approved an instruction that "the law presumes a premeditated design from the naked fact of killing."[8] To the contrary, the court there held the instruction to be erroneous but, under the circumstances, not prejudicial. It is clear that while the existence of premeditation may be inferred from all of the circumstances, it cannot properly be inferred from the mere fact of killing alone and can never be presumed in the sense that it must be found from a given state of facts.

■ Apart from the accuracy of the instruction, we would question the propriety, in cases like that before us, of charging the jury with regard to any presumptions on intent. In civil cases we hold that a presumption is merely a procedural device which controls the burden of going forward with the evidence, and hence, disappears whenever substantial countervailing evidence appears from any source.[9] It fol-

___

with the general rule that specific intent can never be presumed. See, State v. Higgin, 257 Minn. 46, 99 N. W. (2d) 902; Morissette v. United States, 342 U. S. 246, 72 S. Ct. 240, 96 L. ed. 288. However, it has been suggested that where there has been an actual homicide the specific intent of the defendant is no longer "pure surmise" and the presumption is, therefore, justified. See Note, *Presumption of Deliberation and Premeditation—The Doctrine of Hunter Hill's Case,* 33 Va. L. Rev. 531.

[6]See, State v. Shippey, 10 Minn. 178 (223); State v. Brown, 12 Minn. 448 (538); State v. Wormack, 150 Minn. 249, 184 N. W. 970; State v. Miller, 151 Minn. 386, 186 N. W. 803.

[7]See, e. g., State v. Chase, 78 Ariz. 240, 278 P. (2d) 423; People v. Gonzales, 87 Cal. App. (2d) 867, 198 P. (2d) 81; State v. Wilson, 234 Iowa 60, 11 N. W. (2d) 737; State v. Hawkins, 214 N. C. 326, 199 S. E. 284; State v. Cunningham, 173 Ore. 25, 144 P. (2d) 303. See cases collected in 3 Underhill, Criminal Evidence (5 ed.) § 643.

[8]See, State v. Prolow, 98 Minn. 459, 462, 108 N. W. 873, 875.

[9]Ryan v. Metropolitan Life Ins. Co. 206 Minn. 562, 289 N. W. 557;

lows, and we have held, that instructing the jury as to the existence of a presumption gives it an artificial probative effect which is misleading and confusing.[10] The considerations in criminal cases are, of course, somewhat different. Where a defendant in a civil case fails to produce evidence to oppose the presumption operating against him, the court is obliged to direct a verdict for the plaintiff. However, in criminal cases the absence of countervailing evidence cannot result in a directed verdict[11] and consequently the presumption fails to have its intended effect. It may be that under such circumstances some deviation from the rule in civil cases is required.

In the instant case, however, all of the facts surrounding the homicide were put in evidence by eyewitnesses. The defendant testified that the gun went off accidentally twice in the course of the struggle. Intent and premeditation having thus been put in issue, no legitimate purpose could be served by an instruction on presumptions as to the defendant's intent.

The state argues that the elimination of instructions dealing with presumptions as to intent and premeditation in homicide cases would impose upon the state the often impossible task of proving intent and premeditated design by direct rather than circumstantial evidence. The fact that premeditation in some cases must be established by inference does not justify instructions on presumptions. As has been pointed out, the jury may be advised as to their right to draw reasonable inferences from all of the facts surrounding the killing. In addition, the court may, in proper cases, mention to the jury by way of comment on the evidence the permissible inference upon which a presumption is based.[12] The giving of a mandatory presumption, however, is of far greater effect and quite distinct from directing the jury's attention to

---

Roeck v. Halvorson, 254 Minn. 394, 95 N. W. (2d) 172; Lynghaug v. Payte, 247 Minn. 186, 76 N. W. (2d) 660, 56 A. L. R. (2d) 1090; Kath v. Kath, 238 Minn. 120, 55 N. W. (2d) 691; Knuth v. Murphy, 237 Minn. 225, 54 N. W. (2d) 771.

[10]TePoel v. Larson, 236 Minn. 482, 53 N. W. (2d) 468.

[11]See, State v. Corey, 182 Minn. 48, 233 N. W. 590.

[12]See, State v. Higgin, 257 Minn. 46, 51, 99 N. W. (2d) 902, 906.

particular inferences which might properly and reasonably be drawn from the evidence.

There are a number of criminal decisions in which this court has approved instructions relating to presumptions, even where all the facts have been adduced and countervailing evidence appeared. However, cases decided prior to TePoel v. Larson, 236 Minn. 482, 53 N. W. (2d) 468, are of doubtful value and significance since the court in that case expressly overruled contrary expressions of opinion in earlier decisions. State v. Axilrod, 248 Minn. 204, 79 N. W. (2d) 677, relied upon by the state, is distinguishable in that the challenged instructions there did not include any reference to "premeditated design"[13] and the case involved an unwitnessed killing.

Other than as previously noted, there is no rational basis for distinguishing between criminal and civil cases in so far as the propriety of giving instructions on presumptions is concerned. Whether the principle prohibiting such instructions should also apply in unwitnessed homicide cases or other situations where countervailing evidence is not adduced must be left for future decision since the question is not now before us. It is apparent, however, that the preferable practice in any case is to limit the instructions to the permissible inferences upon which the presumptions are based.

■ Whether the giving of an erroneous instruction constitutes prejudicial error must, of course, be determined upon the facts of each particular case. The defendant here made no objection nor did he take any exception to the instruction at the time of trial. Neither did he raise the error in his motion for a new trial. Under such circumstances a new trial cannot be granted unless it is shown that the error was one of fundamental law or controlling principle and that it substantially and materially prejudiced the defendant's rights.[14]

---

[13]The instruction objected to was as follows: "Every homicide is presumed unlawful, so that when the mere act of killing is proved, without any more being shown, the killing is presumed to be intentional and malicious and prompted by the ordinary and natural operations of the mind."

[14]State v. Billington, 241 Minn. 418, 63 N. W. (2d) 387; State v. De-Zeler, 230 Minn. 39, 41 N. W. (2d) 313, 15 A. L. R. (2d) 1137.

Prior to giving the erroneous instruction, the trial court carefully and exhaustively charged the jury as to the essential elements of the offense, including premeditation, and placed special emphasis on the burden and requirement of the prosecution to prove each essential element of the crime beyond a reasonable doubt. It may have been that the insertion of the phrase "with premeditated design" in the instruction dealing with the presumption was an unintentional misstatement which the defendant, by reason of his failure to object, is now barred from raising. But more important, we do not see how the substantial rights of the accused could have been prejudiced by the instruction in question. Regardless of the element of premeditation, the verdict of the jury clearly indicates that it disbelieved the defendant's version of the killing. If the theory of the defense had been accepted in any respect the jury, under the instructions, would have been clearly obliged to acquit the defendant or to return a verdict of guilty in a lesser degree.

The granting of a new trial in criminal cases is done cautiously. Technical errors are not in themselves sufficient to require a new trial. Where it appears that the accused has not been prejudiced through the impairment of substantial rights essential to a fair trial, a conviction will not be set aside for mere technical errors.[15] The instructions here were most comprehensive, and considered as a whole, could not have misled or confused the jury. The evidence of the defendant's guilt was overwhelming. In this situation "alleged errors not affecting his substantial or constitutional rights should be brushed aside, and in their place substituted the almighty force and power of truth. * * * The safeguards thrown around accused persons are not intended as a means to enable the criminal to effect an escape from the punishment his crime calls for, but to protect the innocent * * *."[16] In the absence of timely objection by the defendant under the circumstances here, it would be manifestly improper for us to set aside the conviction.

◼ The defendant also contends that the trial court erred in refusing to admit evidence that sometime prior to the killing Farrell had

---

[15]State v. Billington, 241 Minn. 418, 427, 63 N. W. (2d) 387, 393.
[16]State v. Dimler, 206 Minn. 81, 85, 287 N. W. 785, 786.

been convicted of the crime of "larceny against the person." He argues that such evidence tends to establish the bad character of the deceased and is relevant and material where self-defense is in issue. Evidence of the victim's reputation for violence and quarrelsomeness may properly be shown for the purpose of determining (1) whether the defendant was reasonably put in apprehension of serious bodily harm,[17] or (2) who, in fact, was the aggressor.[18] Where the latter purpose is involved it is not necessary that the victim's reputation be known to the defendant. However, it is settled in this jurisdiction that evidence of a specific act of violence is not admissible for this purpose.[19]

■ Under any rational view of the evidence the jury could not have properly found the defendant guilty of manslaughter in the second degree, and hence the court did not err in refusing to submit this offense to the jury.[20]

The defendant's other assignments of error have been carefully considered and found to be without merit. The judgment of conviction is affirmed.

Affirmed.

---

[17]2 Wigmore, Evidence (3 ed.) § 248.

[18]State v. Dumphey, 4 Minn. 340 (438); 1 Wigmore, Evidence (3 ed.) § 63; see, Campbell v. Aarstad, 124 Minn. 284, 144 N. W. 956.

[19]State v. Ronk, 91 Minn. 419, 98 N. W. 334. Contra: 1 Wigmore, Evidence (3 ed.) § 198.

[20]See, State v. Stevens, 184 Minn. 286, 291, 238 N. W. 673, 675.