STATE of Minnesota, Respondent,

v.

Robert Hilliard TAYLOR, a.k.a. Hilliard
Taylor, Appellant.

No. 46545.

Supreme Court of Minnesota.

Sept. 23, 1977.

C. Paul Jones, Public Defender, Rosalie E. Wahl, Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, William B. Randall, County Atty., Steven C. DeCoster, Asst. County Atty., St. Paul, for respondent.

Heard before KELLY, TODD, and PLUNKETT, JJ., and considered and decided by the court en banc.

TODD, Justice.

Robert Hilliard Taylor was convicted by a jury of murder in the third degree. Taylor based his defense at trial upon the claim that he had acted in self-defense. During the proceedings, the trial court refused to permit Taylor to introduce oral statements made by him to friends and the police, to introduce a stenographic statement of his version of the facts, or to introduce the victim's past criminal record of convictions. We affirm.

On June 17, 1975, after running several errands, Taylor purchased a bottle of wine and returned to the rooming house into which he had recently moved at 825 Dayton Avenue in St. Paul. The house is a large two-story residence owned by Dutch and Mary Sutton who rented rooms in the house to several individuals. Upon returning home, Taylor began talking and drinking with Mildred Smith, his girlfriend, and with the Suttons and several other residents of the rooming house.

At approximately 7:45 p.m., Taylor went out to purchase another bottle of wine. When he returned home, William Barnes, another tenant, was seated at the dining room table with the group. Taylor left the house again at 9 p.m. to pick up a bottle of pain pills prescribed for his back condition. Upon arriving at the drug store, he found it was closed so he walked to his sister's house at 1005 Iglehart and obtained a ride back to the rooming house.

It was approximately 9:30 p.m. when Taylor returned home. By this time,

Barnes had already retired for the evening to his room on the second floor to "sleep it off." At about 11 p.m., India Smith, Mildred's daughter, arrived at the house and almost immediately engaged in a noisy argument with her mother in the hallway directly beneath Barnes' room. Shortly after the argument commenced, Taylor went upstairs to place Mildred's purse in his room and began washing out a shirt in the bathroom directly across from his room.

The noise generated by the argument in the lower hallway evidently awakened Barnes, who came out of his room and told the Smiths to be quiet. As the argument increased in its intensity, Barnes and Mildred began to exchange insults and threats. Finally, Taylor stepped into the hallway and told Barnes to go back in his room since it was an argument between mother and daughter. Taylor returned to the bathroom but the insults and threats between Barnes and the Smiths continued to be exchanged. Taylor again stepped out into the hallway and told Barnes that it was up to the Suttons, as owners of the house, to stop the argument. In response to this suggestion, Barnes informed Taylor that he would "kick his ass" if he did not "shut up."

Taylor then crossed the hallway and returned to his room. According to his testimony,[1] as he started to leave his room he saw Barnes walking down the hall brandishing a knife. He further testified that he asked Barnes to forget about the whole matter but Barnes replied, "I'm going to teach you a lesson about running your mouth." Taylor ran into his bedroom and armed himself with a pistol which was in Mildred's purse. He testified that he stepped back into the hall, asked Barnes to stop, and then fired one shot at Barnes which struck him in the chest area. Mildred and India Smith both testified that they heard Taylor scream, "Man, don't grab me" and then a gunshot.

Taylor then proceeded to walk past Barnes and down the staircase, exclaiming: "I shot the man. I shot the man." He attempted to give the pistol to Mary Sutton who refused to take it. Taylor then left the house without a shirt, stating that he did not intend to run from the police.

Barnes also came down the stairs, went into the dining room, and then fell to the floor dead. Taylor stopped at a friend's house to borrow a shirt and then proceeded to his sister's house. The St. Paul police had already stopped by the sister's house and had advised her that it would be in Taylor's best interests to give himself up. Shortly after Taylor arrived at his sister's home, the police department was telephoned and informed that Taylor would be surrendering himself. After he surrendered himself at the police station and turned over the weapon used in the shooting, Taylor made an oral statement to the police about the incident.[2] At approximately 10 a.m. the following morning, a stenographic statement of Taylor's version of the facts was taken and signed by him.

The subsequent police investigation of the matter revealed several informative facts. Barnes was a very large man, approximately 6 feet, 6 inches, and weighing in excess of 250 pounds. At the time of his death, Barnes' blood alcohol content was measured at .24 percent. Taylor was a smaller man, standing 6 feet and weighing between 160 and 170 pounds. He also had experienced severe problems with his back which required him to undergo three back operations in 1968 and 1969.

The officers investigating the scene of the shooting traced a trail of blood from the dining room to the landing on the second floor at the top of the staircase. A bone-handled knife was ultimately found inside Barnes' room on top of the door molding which was approximately 7½ feet from the floor. The knife was tested for fingerprints by the police crime laboratory unit with negative results. The officer perform-

1. The police investigation of the shooting ultimately determined that there were no living eyewitnesses to the actual shooting of Barnes other than Taylor.

2. Prior to making his statements to the police, Taylor was informed of and afforded his *Miranda* rights.

ing the fingerprint tests testified, however, that because the knife was bone handled, Barnes could have held it without leaving a discoverable fingerprint.

Taylor was charged with both murder in the second degree and murder in the third degree. The jury found Taylor guilty of murder in the third degree. After affording him his right of allocution, the trial court sentenced him for a period of 0 to 25 years' imprisonment. Taylor appeals from the judgment of conviction entered pursuant thereto.

The following 'issues were presented on appeal:

(1) Whether the trial court erred in refusing to admit the victim's criminal record which included convictions for simple assault and disorderly conduct, offered on the issue of self-defense as evidence of Taylor's reasonable apprehension of danger.

(2) Whether the trial court erred in refusing to admit the oral statements made by Taylor to friends and the police shortly after the shooting incident.

(3) Whether the trial court erred in refusing to admit the entire contents of a stenographic statement of Taylor's version of the facts taken by the police the morning after the shooting incident.

(4) Whether the trial court erred in denying the defense motion made at the close of the state's case for a ½-day continuance.

(5) Whether the jury instructions on the issue of self-defense were adequate.

(6) Whether there is sufficient evidence to sustain the jury determination of Taylor's guilt of murder in the third degree.

1. Taylor contends that the trial court committed reversible error in refusing to admit into evidence Barnes' criminal record. He maintains that such evidence would show a pattern of aggressive and assaultive behavior, going to the issue of who was the aggressor in the incident, as well as to the merit of Taylor's claim of reasonable apprehensions of serious bodily harm. The particular crimes for which Barnes had been convicted were simple assault and drunk and disorderly conduct. After examining the record in chambers, the trial court determined not to allow the proffered exhibit in evidence.

This court has held in several recent decisions that the legal excuse of self-defense has four requirements. In *State v. Boyce*, 284 Minn. 242, 253, 170 N.W.2d 104, 112 (1969), citing *State v. Johnson*, 277 Minn. 368, 373, 152 N.W.2d 529, 532 (1967), the elements of self-defense were enumerated as follows:

"'It is a general rule that the legal excuse of self-defense is available only to those who act honestly and in good faith. The rule requires (1) the absence of aggression or provocation on the part of the slayer; (2) the actual and honest belief of the slayer that he was in imminent danger of death, great bodily harm, or some felony and it was necessary to take the action he did; (3) the existence of reasonable grounds for such belief; and (4) the duty of the slayer to retreat or avoid the danger if reasonably possible.'"

In an earlier decision, *State v. Keaton*, 258 Minn. 359, 104 N.W.2d 650 (1960), this court addressed the issue of the admissibility of evidence of a specific criminal conviction of the victim to bolster the defendant's claim of self-defense in a murder case. We held that evidence of a victim's reputation for violence is admissible for certain purposes but evidence of a specific act of violence is not. We stated:

"The defendant also contends that the trial court erred in refusing to admit evidence that sometime prior to the killing Farrell had been convicted of the crime of 'larceny against the person.' He argues that such evidence tends to establish the bad character of the deceased and is relevant and material where self-defense is in issue. Evidence of the victim's reputation for violence and quarrelsomeness may properly be shown for the purpose of determining (1) whether the defendant was reasonably put in apprehension of serious bodily harm, or (2) who, in fact, was the aggressor. Where the latter purpose is involved it is not necessary that the victim's reputation be known to

the defendant. However, it is settled in this jurisdiction that evidence of a specific act of violence is not admissible for this purpose." 258 Minn. 366, 104 N.W.2d 656.

Recently, in *State v. Matthews*, 301 Minn. 133, 134, 221 N.W.2d 563, 564 (1974), the rule enunciated in the *Keaton* decision was expanded to allow the admission into evidence of specific acts of violence by the victim on the issue of whether the defendant was placed in reasonable apprehension of serious bodily harm:

"In this case the issue is whether evidence of a specific act of violence is admissible for the other purpose, that is, determining whether the defendant was reasonably put in apprehension of serious bodily harm. Having considered this matter carefully, we believe that the better rule is that advocated by Wigmore, that evidence of a specific act of violence is admissible in the discretion of the trial court where commonsense indicates that these acts could legitimately affect a defendant's apprehensions. 2 Wigmore, Evidence (3 ed.) § 248."

However, it should also be noted that in the *Matthews* case the specific acts of violence of the victim were directed at the defendant. In the present case, Barnes' convictions for simple assault and drunk and disorderly conduct in no way involved Taylor.

Thus, this court is presented with the issue of whether a victim's past criminal record, of which the defendant had no knowledge, is admissible as proof of the victim's violent or quarrelsome nature when the legal excuse of self-defense is raised by the defendant. In the *Keaton* case, we held that while the victim's reputation for violence is relevant and material where self-defense is an issue, his prior conviction for larceny against the person was inadmissible

as proof of his bad character. Following this reasoning is *State v. Graham*, 292 Minn. 308, 312, 195 N.W.2d 442, 445 (1972), in which evidence of the victim's convictions for simple assault and aggravated damage to property were inadmissible to prove his violent character. The precise legal issue is to what extent does the recent decision in *Matthews*, which allows evidence of specific acts of violence by the victim to be introduced as proof of the defendant's reasonable apprehension of serious bodily harm, alter the holdings of the *Keaton* and *Graham* decisions which prohibit the introduction of the victim's past criminal record.

An examination of decisions of foreign jurisdictions reveals three distinct approaches to the general problem of what evidence is admissible to prove a victim's violent character when self-defense is an issue. Several jurisdictions still adhere to the traditional rule of excluding evidence of specific violent acts based upon the rationale that a reputation for violence or aggressiveness cannot be proved through evidence of specific acts.[3] Other courts have adopted a "middle ground" which allows the introduction of evidence relating to specific violent acts of the victim directed toward the defendant, but excluding evidence of acts directed at third persons.[4] A third group of jurisdictions permits the introduction of evidence concerning specific violent acts of the victim, without reference as to whom those acts were directed, if the defendant had knowledge of those acts.[5]

A few courts have indicated that the criminal record of the victim, depending on the circumstances of the case, can be introduced as evidence of his violent nature. See, e. g., *State v. Alderette*, 86 N.M. 600, 526 P.2d 194 (1974); *Commonwealth v. Amos*, 445 Pa. 297, 284 A.2d 748 (1971);

---

**3.** See, e. g., *Johnson v. Commonwealth*, 477 S.W.2d 159 (Ky.1972); *State v. Maggitt*, 517 S.W.2d 105 (Mo.1974); *State v. Kimbrough*, 173 Neb. 873, 115 N.W.2d 422 (1962); *State v. Infantolino*, R.I., 355 A.2d 722 (1976).

**4.** See, e. g., *People v. Davis*, 29 Ill.2d 127, 193 N.E.2d 841 (1963); *Henley v. State*, 520 S.W.2d 361 (Tenn.Cr.App.1974).

**5.** See, e. g., *Carmichael v. United States*, 363 A.2d 302 (D.C.App.1976); *Williamson v. State*, 25 Md.App. 338, 333 A.2d 653 (1975); *People v. Knott*, 59 Mich.App. 105, 228 N.W.2d 838 (1975); *Werner v. State*, 66 Wis.2d 736, 226 N.W.2d 402 (1975); *State v. Walker*, 13 Wash. App. 545, 536 P.2d 657 (1975).

*People v. Miller*, 39 N.Y.2d 543, 384 N.Y. S.2d 741, 349 N.E.2d 841 (1976). However, the jurisdictions which permit the introduction of the victim's criminal record as evidence of his violent nature are not absolute in their position on the issue. In each case, the probative value of the criminal record must be considered in order to determine the relevance of the proffered evidence. In *Commonwealth v. Amos*, 445 Pa. 297, 305, 284 A.2d 748, 752, the Supreme Court of Pennsylvania tempered its decision with the following caveat:

"We do not mean to imply that a defendant may introduce any or all of the convictions in a victim's record. To have probative value, these crimes should be 'of the same nature, not too distant in time' vis a vis the alleged aggression. * * * The decision in each case as to similar nature and remoteness, however, rests within the sound discretion of the trial judge."

Further, in *People v. Miller*, 39 N.Y.2d 543, 384 N.Y.S.2d 741, 349 N.E.2d 841 (1976), the Court of Appeals of New York, in a well-written and reasoned opinion, stated:

"The extent to which prior violent acts may be proved rests also in the discretion of the trial court. We are ever mindful of the danger that the principal issues to be resolved may be lost in an endless maze of collateral matters. Moreover, we share the concern that the progress of a criminal trial may become stalled by evidentiary conflicts over matters of tangential relevance, thereby impeding the expeditious administration of justice. Yet, a basic sense of fairness mandates that the defendant be permitted to substantiate his claim that the victim committed specific violent acts in the past because it enlightens the jury on the state of the defendant's mind at the time of the difficulty, and thereby enables them to decide whether he acted rationally under the circumstances. * * *

" * * * Evidence of a conviction for a violent act is, of course, acceptable documentary evidence that would support the defendant's contention, provided he was aware of the conviction at the time of the incident. However, the defendant is not thereby authorized to introduce, without limitations, an entire criminal record which may include convictions for petty matters or for crimes that in no sense could be considered violent. Admission of an entire criminal record is, truly, an effort to disparage the victim's general character and is not probative of the defendant's apprehensive state of mind. We, therefore, are careful to note that while specific convictions for violent acts may be admissible, provided the defendant had knowledge of same, general proof of the victim's criminal disposition is not." 39 N.Y.2d 552, 384 N.Y.S.2d 748, 349 N.E.2d 847.

Thus, even those courts which have indicated a willingness to permit the introduction of the victim's past criminal record in cases where self-defense is an issue place limits upon their rule. The majority of courts insist that the criminal record be relevant to the issue of the victim's violent nature. The determination of the relevancy of proffered evidence involves a consideration and evaluation of its probative value.

In the present case, the trial court refused to admit the victim's criminal record because, in its estimation, convictions of simple assault and disorderly conduct are not the type of offenses which establish a reputation for violence. Although the trial court did not specifically state that the victim's criminal record was irrelevant, its ultimate ruling on the issue involved a consideration and weighing of the probative value of the evidence.

■ In conclusion, although a victim's criminal record may indeed be relevant in certain cases to prove the violent nature of the victim when the legal excuse of self-defense is raised by the defendant, the present case is not such a situation. Convictions for simple assault and disorderly conduct do not appear to be the type of crimes which, by themselves, indicate a violent or quarrelsome disposition. An indi-

vidual may be convicted of either offense by engaging in a rather petty disturbance or activity. Thus, we conclude that the probative value of the convictions contained in Barnes' criminal record is minimal as proof of his violent character and, therefore, the trial court did not commit reversible error in excluding the criminal record from the record.

2. On June 18, 1975, at 3 a.m., Taylor made an oral statement concerning the events surrounding the shooting to Sergeant Opheim of the St. Paul Police Department, who put Taylor's statement in writing and reported it as an "investigation of a death." Several hours earlier, almost immediately after shooting Barnes, Taylor had stopped at a friend's house to borrow a shirt and had also made several statements concerning the shooting incident.

The trial court refused to admit either of the statements into evidence based upon the state's objections that they were hearsay and self-serving. On appeal, Taylor contends that both the oral statement made to the police and the content of the conversation and statements made at his friend's house should have been admitted into evidence under the res gestae exception to the hearsay rule.

■ The general rule is that the res gestae exception to the hearsay rule encompasses spontaneous or excited utterances forming a part of a startling event, when the utterances characterizing the event and the circumstances under which they are made negative the probability of fabrication by the declarant. *State v. Ellis*, 271 Minn. 345, 136 N.W.2d 384 (1965); *Fenton v. Minneapolis Street Ry. Co.*, 252 Minn. 75, 89 N.W.2d 404 (1958). The question of whether a particular statement constitutes a part of an event or transaction so as to be admissible as part of the res gestae rests in the sound discretion of the trial court. *Fenton v. Minneapolis Street Ry. Co. supra.*

The record indicates that the shooting occurred at approximately midnight. The fact that Taylor left the rooming house without a shirt indicates that he was in an excited state at that time. He arrived at his friend's home around 12:30 a.m. to pick up a shirt. A witness who had been present at the friend's home testified she heard Taylor state: "Jerry, I've done something bad. * * * I shot a man. * * * [T]he man had a knife and I told him 'man leave me alone. I don't want to hurt you.' " The state's objections that this testimony was hearsay and that the statements by defendant were self-serving were sustained by the trial court. Thereafter, defense counsel's request to have all of this witness' testimony stricken from the record was also granted by the trial court.

■ At first blush, an excellent argument could be made that the statements Taylor made at his friend's home fall within the res gestae exception. However, additional facts surrounding his short visit at the friend's home indicate otherwise. By his own admission, Taylor remained at the friend's home approximately 15 to 20 minutes, during which time he obtained a shirt, consumed two cans of beer, and discussed the events of the evening. When the events which transpired at the friend's home are considered in their entirety, they do not indicate that the statements were made by Taylor while he was still in an excited state, prompted by the startling occurrence in which he was a participant. Thus, we conclude that the trial court did not abuse its discretion and commit reversible error by refusing to admit the statements Taylor made at the friend's home. The statements were self-serving and do not appear to fall within the res gestae exception to the hearsay rule and therefore were inadmissible.

■ Taylor also made an oral statement to the police at approximately 3 a.m. the next morning. A close reading of this statement which was put in writing by Sergeant Opheim shows that its content is consistent with Taylor's previous declarations. Taylor also contends that this statement falls within the res gestae exception to the hearsay rule and therefore should have been admitted in evidence by the trial court. However, given the context and cir-

cumstances in which the statement was made, we hold that it does not satisfy the requirements of the res gestae exception to the hearsay rule.

3. On the morning following the shooting incident, a stenographic statement of Taylor's version of the facts was taken by police. A reading of the statement reveals that its basic content is consistent with the statement made earlier that morning to Sergeant Opheim and with Taylor's testimony at trial. The state did not elect to introduce the statement in its presentation of the case.

Prior to Taylor's testifying in his own defense, an in-chambers discussion was held wherein defense counsel stated his intention to introduce the stenographic statement as an exhibit at the end of Taylor's testimony for corroborative purposes. The state then interposed an objection to the introduction of the statement, contending again that it constituted hearsay and was self-serving in nature. The trial court sustained the objection and the following discussion took place:

"MR. FALVEY: One other last matter, Your Honor, and it would be the position of the defendant that if counsel for the State uses this statement for purposes of cross examination or impeachment, that at such time as he would use that, he would then open the door for me to introduce the entire statement.

"THE COURT: I think he would open the door for you to use such other portions of the statement as are related to or related to the testimony which the defendant refers to or which are rehabilitative of those portions of the testimony but the mere fact that a person uses one portion of a statement doesn't thereby render all portions of the statement admissible."

Taylor argues that the trial court ruling on this matter constituted reversible error. The trial court possesses a certain amount of discretion concerning the admissibility of evidence. It is obvious that the stenographic statement constitutes hearsay and is self-serving in nature. Also, since the statement basically parallels the defend-

ant's testimony at trial, its evidentiary value could also be characterized as cumulative. Thus, the trial court did not commit reversible error in refusing to admit the statement into evidence.

Further, we observe that a practical reason exists for not allowing the introduction of self-serving statements. To permit the introduction of such statements could afford a defendant the opportunity to present his version of the facts without ever being subject to cross-examination by the state. However, once the defendant takes the stand, he can testify that he did make a statement to the police which is in their possession and that the basic import of the statement is consistent with his present testimony. The matter then becomes a tactical judgment to be made by the prosecution concerning whether the state should consent to the introduction of the statement into evidence. If the statement is admitted into evidence, both the prosecution and defense are allowed to argue its relative evidentiary importance to the jury. If the prosecution elects not to introduce the statement into evidence, the defense can include this fact and any significance it may have in its final argument to the jury.

Taylor also argues that the trial court committed reversible error in denying his motion for a ½-day continuance at the close of the state's case and that the jury instructions on the issue of self-defense were inadequate. After an examination of the record, we conclude that these contentions are without merit.

4. Finally, Taylor contends that the jury verdict in this case is not supported by sufficient evidence. When reviewing and evaluating the sufficiency of the evidence to support a conviction, this court will not try the facts anew. *State v. Daml*, 282 Minn. 521, 162 N.W.2d 240 (1968). When determining the sufficiency of the evidence, the scope of review is limited to ascertaining whether, upon the evidence contained in the record, the jury could reasonably find the defendant guilty of the offense charged. *State v. Houff*, Minn., 243

N.W.2d 129 (1976); *State v. Fulford*, 290 Minn. 236, 187 N.W.2d 270 (1971). With these general principles in mind, and after a complete reading of the transcript, we hold that the jury verdict of guilty of murder in the third degree is supported by the evidence.

Affirmed.