STATE of Minnesota, Respondent,

v.

Donald Wayne MARTIN, Appellant.

No. 46680.

Supreme Court of Minnesota.

Dec. 9, 1977.

C. Paul Jones, Public Defender, Gregory A. Gaut, Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Gary W. Flakne, County Atty., Vernon E. Bergstrom, Chief, Appellate Division, David W. Larson, Phebe S. Haugen and Lee W. Barry, Asst. County Attys., Minneapolis, for respondent.

Heard before SHERAN, C. J., and PETERSON and TODD, JJ., and considered and decided by the court en banc.

PETERSON, Justice.

At a jury trial in district court defendant, Donald W. Martin, was convicted of the first-degree murder of Jacqueline Patterson and sentenced to life imprisonment. On appeal from the judgment defendant challenges the admission of certain evidence, the court's instruction to the jury defining premeditation, and the sufficiency of the evidence to sustain the jury's finding of premeditation. We reject these challenges and affirm the judgment.

In the early morning of Friday, June 20, 1975, defendant, together with Robert Wright and James Warborg, drove to the Victoria Hotel on 13th and Harmon in Minneapolis. Defendant entered the hotel and emerged with Miss Patterson. With defendant at the wheel, the four drove around the warehouse district near downtown Minneapolis and eventually parked the car by a fence along the west bank of the Mississippi River across from Nicollet Island. Defendant and Miss Patterson walked away from the others to a wooded area along the river bank and returned to the others several minutes later. Wright and Miss Patterson then walked to the wooded area and had sexual relations. When they returned to the car, Warborg declined to "talk" to (meaning, go to the wooded area with) Miss Patterson and the four drove off.

After driving around the immediate vicinity for 15 to 20 minutes, defendant again parked at about the same place near the river bank. Wright testified as to the events which then occurred. Defendant told Miss Patterson "there was something down by the river he wanted to show her to let her know she should keep her mouth shut." Defendant and Wright got out of the car and took Miss Patterson down a slope toward the river; Warborg remained behind. When they reached a flat area near the river, defendant put his arm around Miss Patterson and led her away from Wright. Wright heard Miss Patterson say, "I have got three kids. You can shoot me, cut me up, or beat me or anything, but don't kill me." After a short conversation, defendant backed away from Miss Patterson and said, "I have got to, baby. I have got to." Defendant brought a knife up to her throat and stabbed her. Miss Patterson doubled over and fell to the ground. Defendant then "started stabbing her around in the breasts and chest and all around * * *." Wright was about 3 to 6 feet away and some of Miss Patterson's blood splattered on him. Defendant got up, wiped his knife off on his pants, walked over to Wright, and handed him the knife. Defendant returned to Miss Patterson, turned her over on her back, ripped open her blouse, pulled another knife from his boot, and started slashing her. The cutting and slashing continued for 15 to 20 minutes. Wright testified that defendant's motions reminded him of "one of these machines that knows what it's doing and will do it right."

When defendant and Wright returned to the car, Warborg was lying in the back seat. Warborg got up as they entered the car and asked what had happened to the girl. Defendant said, "We knocked her unconscious because the girl did not cooperate," and "We better get out of here." As they drove off Warborg again asked what happened. Wright testified that defendant replied, "Well, you might as well know the truth. I killed her." Warborg testified that Wright "did not want to talk about it."

John Stafford, a friend of defendant's, testified that at 6 o'clock in the morning of Friday, June 20, 1975, he received a telephone call from defendant. Defendant told him, "Johnny, I just killed a girl." Stafford asked, "What did you say?" Defendant replied, "I just killed a black chick down by the river." Stafford asked, "What do you mean?" Defendant replied, "You know the hunting knife I use when we go fishing?" Stafford said he did. Defendant said, "I did it with that. If you don't believe me, turn on the TV. Watch the news." Stafford turned on his television, but the news was not being shown. Defendant then said, "Forget what I said about that. I was just joking about killing this girl." They then discussed their planned fishing trip the next day, and the conversation ended with defendant saying he was going to bed.

Defendant was then residing at an apartment leased by Miss Irene Gunlogson. Miss Gunlogson returned to her apartment from work at about 7:20 a. m. that morning (June 20). Defendant was there and she testified, " * * * right away he told me he had some clothes for me to wash." She washed a shirt, slacks, handkerchief, and boots which were spotted with blood. Miss Gunlogson asked what had happened, but defendant refused to tell her anything.

At about 12:20 p. m. that day (June 20) Miss Patterson's body was found by a man taking a walk through the area. Defendant later told Miss Gunlogson that he and Wright had taken a woman down to the Mississippi River and killed her. Defendant said he killed her because she owed him $150 but didn't have the money to repay

him and was going to report him to the police for rape.

Between the evening of June 20, and the early morning of June 22, defendant spoke at various times to his friends, James Delles and Kevin Owens, and his former girl friend, Delores Dillworth. Defendant returned to the scene of the crime while Owens and Delles stood on a nearby hill. Owens, Delles, and Miss Dillworth all testified that during this period defendant told them he had killed a woman down by the river. Defendant showed Owens a hunting knife which was in a fishing tackle box at the Gunlogson apartment and told Owens, "This is the knife I used." Some time on June 22 Owens and defendant left for Kansas City. They returned to Minneapolis several days later and defendant was arrested.

At defendant's trial the deputy medical examiner testified that he found 12 or 13 wounds on Miss Patterson's body. The principal neck wound was an irregular, jagged cut from a point an inch below one ear to a point an inch below the other ear. There were several wounds on her chest and a vertical wound 8 inches in length on her abdomen. This abdominal wound and two wounds near her left breast did not show bleeding. The medical examiner testified that in his opinion this lack of bleeding indicated that the wounds were inflicted after the decedent's heart had stopped beating, i. e., after the time of death.

1. We first consider defendant's argument that the trial court erred in admitting several photographs of the victim's body. Two photographs showed Miss Patterson's body as it was found at the scene of the crime. These were introduced at the beginning of trial through the testimony of the man who found the body and the police officer who was called to the scene. The other photographs (and two slides) were taken at the morgue and were introduced through the medical examiner in conjunction with his testimony as to the nature and extent of the knife wounds.

There is no dispute as to the accuracy of any photograph. Defendant argues, in es-

sence, that because of the grisly nature of the photographs their probative value is substantially outweighed by the danger of unfairly prejudicing the jury.

■ The admission of photographs of a homicide victim's body is governed by the standard enunciated in *State v. DeZeler*, 230 Minn. 39, 41 N.W.2d 313, 15 A.L.R.2d 1137 (1950). There this court held that such photographs are admissible where they are (1) accurate and (2) helpful as an aid to a verbal description of objects and conditions which are relevant to some material issue. When photographs of the victim meet these conditions they "are not rendered inadmissible merely because they vividly bring to jurors the details of a shocking crime or incidentally tend to arouse passion or prejudice." 230 Minn. 47, 41 N.W.2d 319, 15 A.L.R. 1147.[1]

■ The photographs in the present case meet the requirements of accuracy and helpfulness. The photographs taken at the scene of the crime supplemented the testimony of the man who found Miss Patterson's body and the police officer called to the scene. They show the secluded area where the body was found, which the jury could have found relevant to the question of premeditation. The photographs taken at the morgue were an aid to the medical examiner's explanation of the nature and extent of the victim's wounds, which was also relevant to the question of premeditation. While the photographs are gruesome, they are an inseparable part of the facts of the crime.

2. The second evidentiary issue raised by defendant concerns the search, pursuant to consent, of an apartment leased by Miss Irene Gunlogson, with whom defendant was staying. Miss Gunlogson was contacted by Minneapolis police officers 3 days after the victim's body was found. She went with the officers to her apartment and gave them several items of blood-stained clothing which defendant had asked her to wash. The officers asked if they could look for other evidence in the apartment. Miss Gunlogson agreed, and, when the officers found a fishing tackle box, she consented to their examining its contents. Inside the tackle box the officers found a blood-stained hunting knife which was introduced at trial. At the time of the search defendant had been living at the Gunlogson apartment for approximately 2 months but was not contributing to rent and expenses.

■ There is no dispute that Miss Gunlogson's consent was voluntary. The question is whether as a "third party" she could consent to the search of defendant's tackle box. The decisions of the United States Supreme Court establish that authority to consent to a warrantless search derives not from a property interest in the premises but from actual inhabitation. Under this rule a landlord may not validly consent to the search of a house he has rented to another, *Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961), and a hotel night clerk may not validly consent to the search of a customer's room, *Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964). But where several persons are actual co-inhabitants of a premises—

> " * * * it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *United States v. Matlock*, 415 U.S. 164, 171, note 7, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, 250 (1974).

In the present case Miss Gunlogson was undeniably an actual inhabitant of the apartment in which defendant was living as a guest. Given these facts defendant could have no reasonable expectation of privacy viz-a-viz Miss Gunlogson as to any items he left in her apartment. Thus as long as the tackle box was in her apartment she could validly consent to its search. *United States v. Buckles*, 495 F.2d 1377 (8 Cir. 1974) (host could consent to search of jackets belonging to her house guests).

---

1. *State v. DeZeler*, 230 Minn. 39, 41 N.W.2d 313, 15 A.L.R.2d 1137 (1950), is in accord with the general rule. Annotation, 73 A.L.R.2d 769, 787.

■ 3. We turn next to defendant's argument that the trial court erred in instructing the jury as to the meaning of premeditation which is the single element distinguishing first- from second-degree murder. The court instructed the jury:

"Now, premeditation means that the defendant must have considered, planned, prepared for, or determined to commit the act before he committed it. Premeditation, being a process of the mind, is wholly subjective, and hence, it is not always susceptible to proof by direct evidence. It may be inferred from all of the circumstances surrounding the event. It is not necessary that premeditation exist for any specific length of time. A premeditated decision to kill may be reached in a short period of time. However, an unconsidered or rash impulse, even though it includes an intent to kill, is not premeditated."

The first sentence of the instruction almost literally follows the statutory definition of premeditation.[2] The remainder of the instruction follows the language of previous cases. E. g., *State v. Campbell*, 281 Minn. 1, 161 N.W.2d 47 (1968); *State v. Hare*, 278 Minn. 405, 154 N.W.2d 820 (1967), certiorari denied, 391 U.S. 925, 88 S.Ct. 1823, 20 L.Ed.2d 663 (1968); *State v. Keaton*, 258 Minn. 359, 104 N.W.2d 650, 86 A.L.R.2d 649 (1960); *State v. Gavle*, 234 Minn. 186, 48 N.W.2d 44 (1951). We find no error in the instruction.

4. Finally, we reach defendant's argument that the only evidence of premeditation was the testimony of the accomplice Wright, and that Wright's testimony was not sufficiently corroborated as required by Minn.St. 634.04.[3]

■ Corroborating evidence need not establish a prima facie case, it is sufficient if it tends in some reasonable degree to confirm the truth of the accomplice's testimony. *State v. Nelson*, 300 Minn. 506, 217 N.W.2d 769 (1974). Since premeditation is rarely susceptible to direct proof and must be inferred from all the circumstances surrounding a homicide, *State v. Hare, supra*, corroborating evidence of premeditation must be independent evidence (i. e., not from the accomplice) of facts which tend in some reasonable degree to confirm the jury's inference of premeditation.

■ In this case there is ample independent factual evidence which confirms the jury's inference of premeditation. First, Warborg's testimony confirmed that defendant picked up Miss Patterson and drove to a secluded location, left after 15 to 20 minutes to drive around the area, and returned to approximately the same location. Second, Miss Gunlogson and several of defendant's acquaintances testified that defendant said he killed a woman because she owed him money, statements from which the jury could infer a motive and premeditation. Third, there was evidence of the extreme brutality of the killing, the continued stabbing over a period of time, and the infliction of post-mortem wounds. While the brutality of the killing alone might not be sufficient evidence of premeditation, it certainly could be considered by the jury as supporting an inference that defendant premeditated to act as he did. Considered together, these facts, shown by independent evidence, are more than sufficient to confirm Wright's testimony and the jury's finding of premeditation.

Affirmed.

---

2. " * * * '[P]remeditation' means to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Minn.St. 609.18.

3. "A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." Minn.St. 634.04.