STATE of Minnesota, Respondent,

v.

LeRoy McCULLUM, Appellant.

No. 48075.

Supreme Court of Minnesota.

Sept. 7, 1979.

C. Paul Jones, Public Defender, and Linda Matthews Britton, Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Gary W. Flakne, County Atty., Vernon E. Bergstrom, Chief Asst. County Atty., App. Div., and David W. Larson, Asst. County Atty., Minneapolis, for respondent.

Heard before KELLY, SCOTT, and STONE, JJ., and considered and decided by the court en banc.

KELLY, Justice.

Defendant was tried in Hennepin County District Court for the crime of murder in the first degree. He was convicted by a jury and sentenced to life imprisonment.

On appeal, defendant raises two issues:

(1) Whether the circumstantial evidence presented by the state was sufficient to establish the requisite premeditation to sustain a conviction of first degree murder; and

(2) Whether testimony of a police officer that the accused, after being advised of his rights, refused to make a written statement until having the opportunity to speak with an attorney, was overly prejudicial although it was stricken and the jury instructed to disregard it.

Because of appellant's contention that there was insufficient evidence to demonstrate premeditation, the facts, especially those pertaining to the nature of the beating, are of extreme importance and will be set forth with particularity.

The defendant had known the decedent, Sharon Roberts, for some time and she had, in fact, lived with defendant sporadically for about 4 months prior to her death. At the time of her death, however, they had broken off their relationship and were no longer living together.

On November 5, 1976, the decedent had spent much of the day with her friend, Owen Jacobson, age 74, helping him to clean up a bar where he worked. At approximately 3 p. m., she helped Mr. Jacobson carry his groceries upstairs to his apartment. She then helped him put away the groceries and ate dinner with him.

At approximately 5:45 p. m., the defendant arrived at Mr. Jacobson's looking for decedent. According to Mr. Jacobson, defendant and Ms. Roberts decided to go out for a drink. Mr. Jacobson reminded the decedent that she had promised to go to her mother's, but she merely responded that she was going out with defendant and left.

The following day the Minneapolis police department was called by defendant. Captain Blake of the rescue squad entered defendant's room and found Ms. Roberts lying in bed apparently dead.

When the police arrived, defendant identified himself and explained that the dead woman was Sharon Roberts, his girlfriend. Officer Joyce of the Minneapolis Police Department asked defendant what happened. Defendant told him that he had talked with decedent at Jacobson's apartment the previous evening. He stated that she left alone at 7 p. m. to go to the Elks Club. According to defendant, he stayed at Jacobson's until returning home at 8 p. m. Upon his arrival he received a phone call from decedent who told him that she had been badly beaten and robbed by two men and was on her way home. Shortly thereafter, defendant observed a white and red car pull up from which decedent hurriedly exited. Defendant said that he hastened to the front door, opened it and saw that decedent was bleeding from her head. She appeared to him to have received a severe beating. Defendant stated that he washed her face and put her to bed at approximately 10 p. m. that evening after she had refused to go to a doctor for treatment.

Defendant related that later that evening there was a small disturbance at the rooming house where he lived caused by a small fire in one of the rooms. According to defendant, he was awakened by the commotion. Decedent was also awakened at that time. Defendant told Officer Joyce that upon awakening the next morning he discovered she was dead and called the police.

The decedent's body was examined externally in defendant's apartment by John J. Plunkett, M.D., Deputy Medical Examiner who later that evening performed an autop-

sy at the morgue. Dr. Plunkett testified that the ultimate cause of decedent's death was a tension pneumothorax due to the fracture of the ribs with a lung laceration allowing air to escape from the lung and then build up under pressure in the right chest cavity. The exact time of death could not be ascertained but it was estimated at between 9 p. m. and 3 a. m. The medical examiner also testified that decedent's wounds were inflicted approximately one-half to two hours before her death, casting doubt on defendant's explanation of her death. He stated further that decedent also suffered numerous other injuries including a scalp laceration, a ruptured bladder, two incised wounds in the vagina and fractures of the jaw, ribs, thyroid cartilage and hyoid bone. On direct examination, Dr. Plunkett testified that the neck injuries were severe enough to have caused death in and of themselves. In response to a hypothetical question, Dr. Plunkett stated that to a reasonable medical certainty, a person who had sustained injuries of the type found on decedent would not likely have been able to make a telephone call, carry on a conversation, take an automobile ride and then get out and walk some distance into a house and up a stairway.

Defendant's version of the occurrence was also disputed by the testimony of a neighbor who had seen decedent's face during the commotion in the rooming house and testified that she did not appear to have had any signs of injury whatsoever.

█ 1. Defendant contends that the state has not sufficiently established the element of premeditation to sustain a conviction of murder in the first degree. It is well settled in Minnesota that a presumption of premeditation may not be raised from a particular set of circumstances. In *State v. Keaton*, 258 Minn. 359, 363, 104 N.W.2d 650, 654, 86 A.L.R.2d 649, 653 (1960), we stated:

" * * * It is clear that while the existence of premeditation may be inferred from all of the circumstances, it cannot properly be inferred from the mere fact of killing alone and can never

be presumed in the sense that it must be found from a given state of facts."

It has been established, however, that because the state of one's mind can rarely be proven by direct evidence, a jury may infer the requisite state of mind from the nature of the accused's conduct. Id.

In *State v. Neumann*, 262 N.W.2d 426, 430 (Minn.1978), we held:

" * * * Extensive planning and calculated deliberation need not be shown by the prosecution. The requisite 'plan' to commit a first-degree murder can be formulated virtually instantaneously by a killer."

The state argues that in the present case, the severity of the beating which would, of necessity, have taken a while to administer, coupled with defendant's alleged motive to harm decedent due to the recent breakup of their relationship, establishes beyond a reasonable doubt the presence of premeditation and that therefore the jury could have reasonably reached such a conclusion.

In *State v. Walker*, 306 Minn. 105, 235 N.W.2d 810 (1975), certiorari denied, 426 U.S. 950, 96 S.Ct. 3172, 49 L.Ed.2d 1187 (1976), we held that the length and severity of a beating showed beyond a reasonable doubt that the elements of murder in the first degree were satisfied. We do not interpret *Walker* to mean that the duration of a beating alone will support the finding of premeditation, see, *State v. Swain*, 269 N.W.2d 707, 714 (Minn.1978); *State v. Martin*, 261 N.W.2d 341, 345 (Minn.1977), rather such a determination must be justified by an examination of the totality of the circumstances. *State v. Marsyla* 269 N.W.2d 2, 6 (Minn.1978). In addition, due deference must always be given to the jury's verdict. As we stated in *State v. Norgaard*, 272 Minn. 48, 52, 136 N.W.2d 628, 632 (1965):

" * * * If the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that defendant was proven guilty of the offense charged, a reviewing court will not disturb its verdict."

Looking at the facts of the instant case, there is no question that a severe and lengthy beating was the cause of decedent's death. As such, the jury could well have believed that a beating of this duration could only have been administered with planning and deliberation although there was no direct evidence of such. The nature of the wounds and their placement lend credence to that theory. There was evidence presented to the jury that decedent's breakup of her relationship with defendant constituted the motive for the crime. Additionally, Dr. Plunkett testified that the fractures of the hyoid bone and thyroid cartilage could have resulted from manual strangulation, a factor which further bolsters the verdict.

Precisely because premeditation is a subjective element which is not susceptible of direct proof and must be inferred from objective evidence of the circumstances of a killing, *State v. Gayle*, 234 Minn. 186, 197, 48 N.W.2d 44, 51 (1951), we do not wish to be understood as adopting a view that the brutality of a beating alone will justify a finding of premeditation. We have not hesitated to vacate a jury finding of premeditation when we were not satisfied that it was justified by the circumstances as a whole, although it too encompassed a serious beating. *State v. Swain*, 269 N.W.2d 707 (Minn.1978). After a close examination of the facts of the case before us, we believe that the evidence presented was sufficient to justify the jury's finding of premeditation and to sustain the conviction.

■■ 2. The second issue raised on appeal concerns the testimony of Lt. Searles regarding statements of the defendant made during the preliminary police investigation. According to Lt. Searles' testimony, after arriving at the scene he observed the body of decedent lying under a cover on the bed. He examined the body briefly and then approached two officers who were talking with defendant and asked them if the suspect had been advised of his constitutional rights. When the officers responded that he had not, Lt. Searles testified that he immediately read the defendant his con-

stitutional rights from a plastic card. Defendant gave Searles a detailed oral statement of his version of the events. Lt. Searles testified further that he questioned defendant about the circumstances surrounding decedent's death and then examined the premises. The following exchange at the trial then occurred:

"Q. All right. After you checked the hallway and the stairs, what did you do then?

"A. I advised the suspect that he was under arrest for probable cause homicide.

"Q. And after that?

"A. I asked him if he wished to give me a written statement on what he had just told me, and he stated that he would rather talk to a lawyer first.

MR. HALL: Your Honor, that answer is objected to and I move it be stricken and the jury instructed to disregard it.

THE COURT: So ordered. Be stricken."

Searles also testified that soon after refusing to give a written statement the defendant gave another oral statement. The following day, the judge, without consulting either counsel, further cautioned the jury that they were to disregard the testimony and not allow it to affect their ultimate decision.

The question before this court is whether, in spite of the cautionary instructions directed toward the jury, the testimony of Lt. Searles that defendant refused to give a written statement until he had talked to an attorney so prejudiced defendant's right to a fair trial as to require reversal.

The general rule is that the state may not refer to or elicit testimony of a defendant's post-arrest silence and/or request for counsel, and our decisions have followed this rule. See, e. g., *State v. Roberts*, 296 Minn. 347, 208 N.W.2d 744 (1973). However, while the United States Supreme Court in *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), held that as a general rule evidence of post-arrest silence following a *Miranda* warning may not be used to impeach exculpatory testimony of a defendant, the court also indicated in a footnote—

see 426 U.S. 610, 619, n. 11, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91, 98—that such silence may be used to challenge a defendant's testimony as to his behavior after arrest, as when he testifies to an exculpatory version of events and claims that he told the police the same version on arrest. Thus, in *United States v. Hood*, 593 F.2d 293 (8 Cir. 1979), the court held that it was proper to cross-examine a defendant about his post-arrest silence when defendant, on direct, testified that he had offered to talk to the F.B.I. And in *United States v. Fairchild*, 505 F.2d 1378 (5 Cir. 1975), the court held that evidence of an accused's silence after the giving of a *Miranda* warning was admissible to rebut the impression created by defendant during the presentation of his case that he had cooperated with the F.B.I. and the U.S. Attorney's office.

In this case the state points out that before Lt. Searles took the stand defense counsel had elicited from other police officers that defendant had been courteous and cooperative with the police. Similar testimony was also elicited from another witness. Testimony that he was cooperative would have, of course, been refuted by testimony that he refused to put his statement in writing until he had talked to an attorney, and the court could have admitted the testimony under the reasoning of the *Doyle* footnote and the decisions in the *Hood* and *Fairchild* cases. The trial judge, having ordered the testimony stricken and having cautioned the jury to disregard it, did more than the defendant was entitled to. We caution prosecutors not to elicit this type of testimony except in atypical cases as where defense counsel have introduced evidence requiring a rebuttal of this nature. Defense counsel should be aware that by creating atypical situations they may be opening the door to a rebuttal of the kind in question here.

Under the circumstances in this case, there would have been no error in admitting the evidence and, in any event, defendant has no grounds for complaint because the testimony was stricken and the jury cautioned to disregard it.

Affirmed.

WAHL, Justice (concurring specially).

Although I concur in the affirmance of the conviction on both issues and agree that no prejudice was suffered by defendant, I do not believe that this case should stand to illustrate an exception to the general rule that evidence of *Miranda* silence is inadmissible.

The questions asked of the police officers were not atypical, nor did the answers create the kind of atypical situation present in the cases cited in the majority opinion. In *United States v. Hood*, 593 F.2d 293 (8 Cir. 1979), the defendant testified on direct examination that he had offered to talk to the F.B.I. when in fact he had refused to do so. Under such circumstances impeachment was held proper. 593 F.2d 297.

Evidence of *Miranda* silence was admissible in *United States v. Fairchild*, 505 F.2d 1378 (5 Cir. 1975), also cited by the majority, where the defendant freely and falsely created the impression that he had cooperated fully and actively with the police when in fact he had not.

The case before us is distinguishable. Since defendant did not take the stand, there was no need to rebut contradictory statements as there was in *Hood, supra*. The evidence of defendant's cooperation, which is claimed to justify rebuttal in the instant case, was created through the testimony of several police officers and a fire department captain on cross-examination.

It was plain fact that defendant did not try to obstruct the movement of the officers, conceal any evidence, or attempt to escape. It is also fact that defendant gave his version of the incident to the officers. It was only when asked to give a written statement that defendant asked to speak first with a lawyer. This evidence of cooperation is not properly rebuttable with evidence that defendant exercised his constitutional right to remain silent.

The trial court acted correctly in instructing sua sponte the jury to disregard the testimony. We should affirm on the basis

that no prejudice was suffered and not conclude, as did the majority, that there would have been no error in admitting the evidence under these circumstances.

ROGOSHESKE, Justice (concurring specially).

I join in the concurring opinion of Justice Wahl.

SHERAN, C. J., took no part in the consideration or decision of this case.