*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0040**

State of Minnesota,
Respondent,

vs.

Jerome Deshawn Misters,
Appellant.

**Filed December 29, 2014
Affirmed
Reyes, Judge**

Washington County District Court
File No. 82CR13316

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Peter Orput, Washington County Attorney, Peter S. Johnson, Assistant County Attorney, Stillwater, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Suzanne M. Senecal-Hill, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Worke, Presiding Judge; Kirk, Judge; and Reyes, Judge.

**U N P U B L I S H E D   O P I N I O N**

**REYES**, Judge

On appeal from his conviction of aiding and abetting attempted first-degree aggravated robbery and possessing a firearm as an ineligible person, appellant argues that

he is entitled to a new trial because the district court committed reversible error. We affirm.

## FACTS

### I. Incident and Arrest

Around 5:00 p.m. on November 21, 2012, L.K. finished her work at the Central Bank building in Newport and started walking to her car in the parking lot across the street. L.K. noticed a small gold Saturn with no front license plate drive down the wrong side of the street and pull into an alley next to the parking lot. A man got out of the passenger side of the car, pointed a handgun at L.K., and demanded her bag. L.K. described the handgun as a silver semi-automatic. As the man was pointing the gun at her, L.K. started yelling and ran back to the bank where she called the police. L.K. described the robber, who was wearing a face mask, as "light skinned, either white or a light ethnicity," slender, and about the same height as appellant. L.K. testified that Misters "could be" the person who robbed her, but stated that she did not see enough of the suspect to be sure.

On the evening of the robbery, Cottage Grove Police Officer Nils Torning was informed about the incident at the beginning of his shift. After further research, Officer Torning learned that the description of the car used at the robbery—a gold four-door sedan—matched the description of a car that was wanted for a gas station drive-off from approximately one week earlier. While on patrol around 7:00 p.m., Officer Torning spotted a "silver or tan" Saturn with no front license plate on 80th Street and Hadley Avenue in Cottage Grove. Torning learned that the rear plate matched the plate from the

2

gas station drive-off and also observed objects hanging from the review mirror, which is an equipment violation. Based on these observations, Officer Torning stopped the car.[1]

Officer Torning identified the driver as A.E. and asked to see her proof of insurance. When A.E. reached into her glove box to retrieve her insurance card, Officer Torning noticed that the glove box contained loose handgun rounds. Officer Torning called for assistance, and, while he was waiting, he identified the passenger as appellant Jerome Misters. Officer Torning asked A.E. and Misters if they had been in Newport that day and both said they had not. As he was talking to them, Officer Torning saw an open bottle of beer inside the car and asked if either of them had been drinking. After both of them denied drinking, Officer Torning asked them to get out of the car and told them he had seen the ammunition in the glove box. Officer Torning performed a pat search of both individuals and asked if there was a gun or anything illegal in the car. A.E. and Misters answered no to both questions.

Officer Torning searched the vehicle and located multiple loose .357 handgun rounds in the glove box, a loose 9 millimeter handgun round in the center console, and a silver Taurus semi-automatic 9 millimeter handgun under the passenger seat where Misters had been sitting. The beer bottle was empty. Officer Torning asked A.E. and Misters individually if anyone had recently used the car and both stated Misters' cousin, Tyrell Harrell, had used it. A.E. and Misters were arrested and taken into custody.

---

[1] The traffic stop occurred approximately 4.3 miles from the location of the robbery.

## II. Events Prior to Arrest

A.E. and Misters picked up Brandon Zuniga at his home in Oakdale. While riding together, A.E. overheard a conversation between Zuniga and Misters in which the two were "talking business about making money." A.E. then observed Misters show Zuniga a silver handgun. A.E. had seen the gun a week earlier and when she confronted Misters about it, he claimed it belonged to his cousin. A.E. was dropped off at her parents' home around 4:30 p.m., and left her Saturn with Misters and Zuniga. They returned to pick A.E. up around an hour later. While en route to Zuniga's home, the three of them traveled along an interstate bridge overlooking Central Bank. While on the bridge, they saw "a bunch of cops and stuff" at Central Bank. A.E. then heard Zuniga ask Misters "if that's where they were at," to which Misters replied, "yes." When A.E. asked them what they had done, the two ignored her. After this exchange, A.E. and Misters dropped Zuniga off at his home. They made one more stop at A.E.'s parents' and were heading back to A.E.'s apartment in Cannon Falls when Office Torning pulled them over.

## III. Events Subsequent to Arrest

Detective Tom Ueland of the Cottage Grove Police Department was assigned to the case. Detective Ueland learned that the gun was registered to B.C., who testified that he had traded the gun to Misters in October 2012 in exchange for three hunting rifles.

While they were in custody, Detective Ueland executed search warrants for the DNA of Misters and A.E. Their DNA samples were compared with samples from the handgun and neither could be excluded as a contributor, though 99.6% of the general population could be excluded. Detective Ueland testified that Misters made statements to

4

him when he went to the jail to obtain the DNA sample. On cross-examination, Detective Ueland stated that Misters admitted to owning the handgun. Detective Ueland acknowledged that Misters had not been Mirandized at this point.

About four or five days after her arrest, A.E. was released from jail. Upon returning home, A.E. discovered ammunition all over her apartment and a shotgun in her storage unit. A.E. contacted Detective Ueland and asked him to help remove them. Detective Ueland seized the shotgun, ammunition, and a Styrofoam case which he later discovered was for the silver handgun.

At trial, the state presented *Spreigl* evidence through Sergeant Paul Paulos of the St. Paul Police Department. Sergeant Paulos testified about an aggravated robbery that occurred in 2002 in which Misters admitted that he and an accomplice attempted to rob a woman at gun point as she walked from a business to her vehicle.

G.S. testified on behalf of Misters. G.S. stated that he and Misters were at an apartment complex in St. Paul Park between 4:30 p.m. and 5:30 p.m. on the day of the robbery. G.S. testified that Zuniga, along with a person named "Sleek," left the apartment in a silver four-door between 4:45 p.m. or 4:55 p.m. and returned before 5:30 p.m. However, G.S. gave a prior inconsistent statement in which he told Detective Ueland that Misters had committed the robbery and that "Sleek" was made up simply to throw off the police because G.S. was scared about new charges being filed against him.

The jury found Misters guilty of aiding and abetting attempted first-degree aggravated robbery and possession of a firearm by an ineligible person. This appeal follows.

5

## D E C I S I O N

Misters makes two general arguments on appeal: (1) the district court erred by admitting inadmissible testimony at trial and (2) the district court erred by admitting evidence which should have been excluded as the product of a Fourth Amendment violation. Both arguments are unconvincing.

## I.

Misters argues that the district court erroneously admitted three instances of inadmissible testimony: (1) Misters's assertion that he would speak to law enforcement if he had an attorney present; (2) Misters's admission that he owned the handgun; and (3) A.E.'s testimony about Misters's conversation with Zuniga on the day of the robbery. Misters states that because these errors were plain and affected his substantial rights, he is entitled to a new trial.

The testimony in question was not objected to during trial. This court has discretion to review unobjected-to error under the plain-error rule. Minn. R. Crim. P. 31.02; *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998). Three conditions must exist in order to satisfy the plain-error rule: (1) there was error; (2) the error was plain; and (3) the error affected the defendant's substantial rights. *State v. Strommen*, 648 N.W.2d 681, 686 (Minn. 2002). When prosecutorial misconduct is not alleged, the defendant has the burden of showing all three prongs. *State v. Sontoya*, 788 N.W.2d 868, 872 (Minn. 2010). If those prongs exist, "we may correct the error only if it seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Strommen*, 648 N.W.2d at 686 (quotation omitted).

6

**A.** **Misters's assertion that he would speak to law enforcement if he had an attorney present.**

On direct examination, Detective Ueland was asked about a conversation he had with Misters two days after the arrest. Detective Ueland testified that "[w]hen Jerome Misters came into the room he immediately told us that he wanted to talk to us but he didn't want to say anything until he had an attorney present." Misters argues that admitting this testimony constitutes plain error which affected his substantial rights.

**1.** **Plain Error**

Generally, the state may not refer to a defendant's post-arrest silence or request for counsel. *State v. McCullum*, 289 N.W.2d 89, 92 (Minn. 1979). This rule is based in a concern that juries will view an assertion of the Fifth Amendment privilege as a badge of guilt rather than the mere assertion of a right. *State v. Roberts*, 296 Minn. 347, 353 208 N.W.2d 744, 747 (1973); *see also State v. Penkaty*, 708 N.W.2d 185, 199-200 (Minn. 2006) (concluding that such testimony is generally inappropriate to the extent that it gives rise to an impermissible inference of culpability). Such a concern is present here, where the jury could have inferred from Detective Ueland's testimony that Misters must have been involved in the robbery simply because he wanted to speak with his attorney first. Because the error contradicts the general rule regarding a defendant's request for counsel, the error is plain. *State v. Matthews*, 779 N.W.2d 543, 549 (Minn. 2010) ("An error is plain if it is clear and obvious; usually this means an error that violates or contradicts case law, a rule, or an applicable standard of conduct.").

7

The state argues that no error exists because Detective Ueland's testimony was admissible under an exception to the general rule. Based on a footnote in *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240 (1976), the Minnesota Supreme Court adopted an exception to the general rule outlined in *McCullum*, 289 N.W.2d at 93. *See Doyle*, 426 U.S. at 619, 96 S. Ct. at 2245 n.11. Under the exception, evidence of a defendant's request for counsel is admissible if offered to "challenge a defendant's testimony as to his behavior after arrest, as when he testifies to an exculpatory version of events and claims that he told the police the same version on arrest." *McCullum*, 289 N.W.2d at 93. Courts have cautioned, however, that the admissibility of this type of evidence will only be appropriate in "atypical" or "extreme cases." *Id.*; *United States v. Fairchild*, 505 F.2d 1378, 1382 (5th Cir. 1975).

The state contends that prior to Detective Ueland's testimony, defense counsel had begun to develop the theory that Misters was cooperative with the police. This theory, according to the state, was developed during the cross-examination of the state's witnesses:

> A: [A.E.] stated that [Misters's] cousin named Tyrell Harrell has possibly been using the vehicle recently.
> Q: Did you ask [Misters] the same question?
> A: I did.
> Q: Did he give you the same answer?
> A: He stated that he had been using the vehicle as well, yes.
> . . .
> Q: Now, when you were talking about this gun that's found in your car earlier you had also mentioned to the officer that Tyrone Harrell had used your car recently.
> A: Uhm, uhm. (Affirmative)

8

. . .

Q: And when you asked [Misters] about the gun or where it came from, where it was going or what it was doing, you were told well, it's his cousin's gun; you testified to that, correct?

A: Uhm, ihm. (Affirmative)

Q: How recently had Mr. Harrell been at your place?

A: I think that morning.

Q: So that very day he was in there. Had he used your car that day?

A: He was in the car.

. . .

Q: Do you remember telling [Officer Torning] that [Misters's] cousin Mr. Harrell had been in the car recently and you let him use the car recently?

A: Uhm, uhm. (Affirmative)

Q: Thinking the gun might have been his?

A: Yes.

Q: All right. [Misters] never told you that he put anything in your car, correct?

A: No.

After carefully reviewing the testimony, it is unclear how such testimony is meant to show that Misters was cooperative with the police. Instead, the testimony elicited is aimed only at showing that the handgun belonged to Misters's cousin and that it could have been he who committed the robbery. The testimony here does not fall under the exception outlined in *McCullum*. *See United States v. Hood*, 593 F.2d 293 (8th Cir. 1979); *United States v. Fairchild*, 505 F.2d 1378 (5th Cir. 1975) (noting in both cases that the defendant was clearly claiming cooperation with the police). The current testimony does not assert cooperation with the police and contains nothing to suggest that Misters's demand for an attorney was "an act blatantly inconsistent with the defendant's trial testimony." *Fairchild*, 505 F.2d at 1382. Thus, the state's arguments that this was not plain error are unconvincing.

### 2.     Substantial Rights

The third prong of the plain-error test requires that the defendant demonstrate that the alleged errors had a significant effect on his substantial rights. *Griller*, 583 N.W.2d at 741. Plain error is prejudicial if "there is a reasonable likelihood that the [error] would have had a significant effect on the verdict of the jury." *Id.* (quotation omitted). This analysis involves examining "the strength of the state's case, the pervasiveness of the error, and whether the defendant had an opportunity to respond to the testimony." *Sontoya*, 788 N.W.2d at 873. The supreme court has described the defendant's burden of persuasion on this prong as a "heavy burden." *Griller*, 583 N.W.2d at 741.

This case consisted of considerable evidence. The state procured testimony from A.E. that just before 4:30 p.m. on the day of the robbery, Misters showed Zuniga a silver handgun while talking about making money. A.E. testified that the two left together in a silver or tan Saturn with no front license plate. The victim, L.K., provided testimony that about 30 minutes later and five miles away, she was robbed by a man using a silver handgun and who rode in a "kind of gold" Saturn with no front license plate. L.K. provided a description of the robber that roughly matched Misters's physical characteristics. B.C. testified that he sold the silver handgun to Misters a month before the robbery. DNA analysis showed that Misters's sample could not be excluded from the DNA sample taken from the handgun, though 99.6% of the general population could. Finally, respondent presented *Spreigl* evidence that Misters previously committed a robbery in the same fashion as the one in the case at hand.

Furthermore, the error was not pervasive and Misters made no effort to rebut it. After Detective Ueland described the meeting in which Misters requested an attorney, the prosecutor simply stated, "Okay. So he told you I have some information for you." and moved on to his next question. The prosecutor made no reference to the request for an attorney in closing arguments or any other portion of the trial. In fact, the improper testimony only amounts to a short paragraph in a 280-page trial transcript. Misters had the opportunity to rebut this evidence which arose midway through trial but made no effort. Misters made no objection and did not request a limiting instruction, which would have required the jury to not use the request for counsel for impermissible purposes.

Because of the strength of the evidence against him, the minimal references to his request for counsel, and his failure to rebut the evidence despite the opportunity, this error did not affect Misters's substantial rights.

**B.** **Misters's acknowledgement that his DNA would be on the shotgun and that the handgun was his**.

Misters next argues that the district court erred in allowing testimony about statements he made without having first received his *Miranda* warnings. This court has discretion to review unobjected-to error under the plain-error rule. Minn. R. Crim. P. 31.02; *Griller*, 583 N.W.2d at 740.

**1.** **Plain Error**

Statements produced by custodial interrogation are not admissible in evidence unless the suspect is first advised of his *Miranda* rights. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966); *State v. Tibiatowski*, 590 N.W.2d 305, 308 (Minn. 1999).

11

The *Miranda* procedural safeguards are required where a suspect is (1) in custody and (2) subject to interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 1689 (1980).[2] The term "interrogation" refers not only to express questioning, but also to any words or actions by police which the police should know are reasonably likely to elicit an incriminating response. *Innis*, 446 U.S. at 302, 100 S. Ct. at 1690. Thus, this court focuses its analysis on whether Misters's admission was voluntarily given, or whether it was in response to interrogation or its "functional equivalent." *State v. Friend*, 385 N.W.2d 313, 321 (Minn. App. 1986), *review denied* (Minn. May 22, 1986).

"Voluntary statements are admissible into evidence and are not barred by the Fifth Amendment." *Id.*; *see also Miranda*, 384 U.S. at 478, 86 S. Ct. at 1630 ("Any statement given freely and voluntarily without any compelling influences is . . . admissible in evidence."). To determine whether Misters's statement was voluntary, this court applies the totality-of-the-circumstances test to the facts found by the trial court. *State v. Jackson*, 351 N.W.2d 352, 355 (Minn. 1984), *appeal after remand* 370 N.W.2d 72 (Minn. App. 1985), *review denied* (Minn. Aug. 20, 1985). In *State v. Gabler*, the supreme court recognized that a statement admitting guilt, given when a defendant interrupted a detective in the process of giving the *Miranda* warning, was voluntary and not barred by *Miranda*. 294 Minn. 457, 458, 199 N.W.2d 439, 440 (1972). The supreme court has also rejected the argument that a confession is inadmissible "if it is followed in

---

[2] It is undisputed that Misters was in custody at the time of the alleged *Miranda* violation.

the same breath with a desire to remain silent." *State v. O'Neill*, 299 Minn. 60, 71, 216 N.W.2d 822, 829 (1974).

On cross-examination, Detective Ueland was asked whether Misters ever acknowledged that he owned the handgun found in the car. Detective Ueland responded, "[Misters] acknowledged that the handgun was his." Although it is unclear from the record, it appears that Misters's acknowledgement occurred during their first meeting on November 23, 2012, when Detective Ueland executed DNA search warrants on both A.E. and Misters.[3] Recalling that meeting, Detective Ueland testified:

> When Jerome Misters came into the room he immediately told us that he wanted to talk to us but he didn't want to say anything until he had an attorney present. And I believe I told him what we were charging him with, and he stated he wanted to talk to us but again wanted an attorney, but he had some information he thought we'd be interested in. And he was alluding to a burglary which had taken place in Newport and he wanted to give us [information] on that, but again wanted to talk to his lawyer first.

As previously noted, Detective Ueland admitted that Misters had not been Mirandized at any point.

Based on the above testimony, the only statement that Detective Ueland made to Misters was to inform him of the charge. The totality of the circumstances do not

---

[3] The record appears to indicate that Detective Ueland had two conversations with Misters. The first occurred on November 23, 2012, as indicated above. The second occurred on November 26, 2012, when Detective Ueland received a phone call from Misters and his attorney asking for some of the charges to be dropped in exchange for information. It appears that all Detective Ueland said during that phone call was that he was unwilling to do that. The ambiguity of the record furthers the point that even if the district court erred in admitting Misters's acknowledgement, such error was not "clear" or "obvious" and thus not "plain." *State v. Kelley*, 832 N.W.2d 447, 453 (Minn. App. 2013), *aff'd on other grounds*, 855 N.W.2d 269 (Minn. 2014).

indicate that this meeting was the functional equivalent of police interrogation such that Detective Ueland should have known it was reasonably likely to elicit an incriminating response. "Simply informing appellant about the subject of the police inquiry before questioning was not an action that police should have known was reasonably likely to elicit an incriminating response." *Friend*, 385 N.W.2d at 321; *but see State v. Seekon*, 392 N.W.2d 624, 627 (Minn. App. 1986), *review denied* (Minn. Oct. 17, 1986) (deciding that where a defendant, in custody in the rear of a squad car, was asked identification questions and advised of the serious charges for which he was arrested, his admission was not volunteered but "indirectly elicited by [an officer]").

### 2. Substantial Rights

Even if Detective Ueland's testimony did constitute plain error, any error did not affect Mister's substantial rights. As previously stated, the case against Misters consisted of considerable evidence, including testimony of multiple witnesses, DNA analysis, and *Spreigl* evidence. Moreover, the error was not pervasive and Misters had an opportunity to rebut the improper evidence but chose not to do so. Accordingly, any error did not affect Misters's substantial rights.

### C. A.E.'s testimony about a conversation she overheard between Misters and Zuniga on the day of the robbery.

Lastly, Misters argues that the district court erred in admitting A.E.'s testimony that when Zuniga asked Misters if "a bunch of cops" were "where they were at," Misters replied "yes." Again, this court has discretion to review unobjected-to error under the plain error rule. Minn. R. Crim. P. 31.02; *Griller*, 583 N.W.2d at 740.

14

### 1. Plain Error

Misters argues that A.E.'s testimony is inadmissible hearsay that does not qualify under the statement-against-interest exception of Minn. R. Evid. 804(b)(3) or the "catch-all" exception of Minn. R. Evid. 807. But Misters offers no reason as to why the testimony is not classified as an adoptive admission under Minn. R. Evid. 801(d)(2)(B). The Minnesota Supreme Court held that 801(d)(2)(B) specifically applies to questions asked by a co-conspirator and affirmatively adopted by a defendant in front of a third-party witness. *State v. Berrisford*, 361 N.W.2d 846, 850 (Minn. 1985). Adoptive admissions do not qualify under any of the hearsay exceptions precisely because they are not considered hearsay in the first place. Minn. R. Evid. 801(d)(2)(B) (providing that "a statement is not hearsay if . . . the statement is offered against a party and is . . . a statement of which the party has manifested an adoption or belief in its truth").

Where evidence is asserted as an adoptive admission, it must first "be manifested by conduct or statements which are *unequivocal*, *positive*, *and definite* in nature," and that clearly show that the defendant intended to adopt the statement as his own. *State v. Goodridge*, 352 N.W.2d 384, 388 (Minn. 1984). Previous case law illustrates a number of examples of adoptive admissions. For example, statements made in the presence of a defendant by a co-conspirator to a third party naming the defendant as the one who shot the victim were found to be adoptive admissions when the defendant helped describe his own involvement in the murder. *Berrisford*, 361 N.W.2d at 850. Similarly admissible were the testimonies of witnesses who saw defendant nod his head immediately after defendant's accomplice made the comment, "I didn't do it, [defendant] did." *State v.*

15

*Shoop*, 441 N.W.2d 475, 482 (Minn. 1989). Lastly, testimony was deemed an adoptive admission where a defendant gestured "like a gun to the head" when he was asked to confirm codefendant's report that each of them had shot a man. *State v. Roan*, 532 N.W.2d 563, 573 (Minn. 1995). If such actions are sufficiently "unequivocal, positive, and definite" enough to qualify as adoptive admissions, then the same can be said of the affirmative "yes" Misters gave in response to Zuniga. And because this statement was made in front of A.E., a third-party witness who was not a party to the crime, it qualifies as an adoptive admission. *Berrisford*, 361 N.W.2d at 850. As such, the district court did not commit plain error.

## II.

In his pro se supplemental brief, Misters alleges that any evidence obtained from A.E.'s vehicle should be suppressed as the result of an unconstitutional search. But because Misters raises this issue for the first time on appeal, this argument is waived. *State v. Sorenson*, 441 N.W.2d 455, 457 (Minn. 1989) ("Usually, we will not decide issues which are not first addressed by the trial court and are raised for the first time on appeal even if the issues involve constitutional questions regarding criminal procedure.").

**Affirmed**.